Harold Glenn **WHITAKER**, Plaintiff-Appellant,

v.

**HARVELL–KILGORE CORPORATION** and Day & Zimmerman, Inc., Defendants-Appellees.

Lura Madden **WHITAKER**, Plaintiff-Appellant,

v.

**HARVELL–KILGORE CORPORATION** and Day & Zimmerman, Inc., Defendants-Appellees.

No. 27206.

United States Court of Appeals Fifth Circuit.

Dec. 3, 1969.

W. Meade Burns, Jr., Robert W. Beynart, for appellants, Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., of counsel.

Thomas R. Bryan, Jr., Columbus, Ga., for White and Atkinson.

Howell Hollis, James M. Manire, Columbus, Ga., for appellee Harvell-Kilgore Corporation (Now Kilgore Corporation); Foley, Chappell, Hollis & Schloth, Columbus, Ga., Chandler, Ma-

nire, Johnson & Chandler, Memphis, Tenn., of counsel.

W. M. Page, Max R. McGlamry, Columbus Ga., Edwin P. Rome, Philadelphia, Pa., for appellee Day & Zimmerman Inc.; Swift, Pease, Davidson & Chapman, Columbus, Ga., Blank, Rome, Klaus & Comisky, Philadelphia, Pa., of counsel.

Before RIVES, COLEMAN and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an appeal by plaintiffs, Harold Glenn Whitaker and his wife, Lura Madden Whitaker, as the result of dismissal of their complaint by the United States District Court. The motion to dismiss was sponsored by defendants, Harvell-Kilgore Corporation and Day & Zimmerman, Inc. Jurisdiction in this Court is founded on diversity of citizenship.

On November 23, 1966, Harold Whitaker was an enlisted man in the United States Army undergoing basic combat training at Fort Benning, Georgia. At that time and place, Whitaker was required to throw a live hand grenade as part of this military training. The hand grenade prematurely exploded, causing serious injuries to plaintiff, including loss of vision and hearing, and loss of his right hand. Fragments caused wounds in both eyes, including a detached retina of the left eye, and punctured his right eardrum.

In his own behalf Whitaker sued the manufacturer of the grenade, Day & Zimmerman, Inc., and the manufacturer of the fuse, Harvell-Kilgore Corporation, for $750,000.00. In another action, consolidated with the principal one, appellant's spouse, Lura Madden Whitaker, sued the same defendants for loss of consortium in the amount of $100,000.00. Each action contained substantially similar counts against both defendants including negligence in manufacture and inspection, breach of implied warranty, breach of expressed warranty of suitability, and strict liability in tort.

Defendant Harvell-Kilgore Corporation filed a motion to dismiss as to each plaintiff for failure to state a claim upon which relief could be granted. The theory of the motion was (1) that under the facts the grenades were in reality furnished by the United States and that any action on account of a defect would be barred by the sovereign immunity of the United States, and (2) that no expressed or implied warranties were made by the United States. Day & Zimmerman filed motions to dismiss predicated on the belief that it functioned solely as an instrumentality of the United States, that the liability of the United States was involved, and that the United States was an indispensable party.

On February 12, 1968, appellees filed the affidavit of Mr. William Moseley, Vice-President of Day and Zimmerman, Inc., in charge of the Lone Star Division of Day & Zimmerman in its operation at Texarkana, Texas. Moseley deposed that Day & Zimmerman operates the government-owned Lone Star Army Ammunition Plant. All component parts and explosives were the property of the Government. Only the fiber glass sleeve was procured by Day & Zimmerman, and title to it passed to the Government on delivery. With respect to component parts the company was expected to make only a visual inspection and was under no duty to make x-ray inspection of the components. Assembly of the grenades followed specifications prescribed by the Government under the continuous surveillance of government inspectors. Finally Moseley concluded should a judgment be obtained against Day & Zimmerman, the burden of satisfying such judgment will rest with the United States Government. The contract imposed upon the company the duty to procure such insurance as the Contracting Officer might require but that the company should be reimbursed for the cost.

Defendant Harvell-Kilgore also filed affidavits in support of its motion. James P. Wray, President of Harvell-Kilgore, stated that the inspection procedures followed by the manufacturer's personnel and by government inspectors were fully approved and regularly moni-

tored by the Government. Special reliance was placed upon an x-ray inspection performed by a machine furnished by the United States. If the fuse body did not interrupt the x-ray beam to the required extent, the fuse was rejected. Robert S. Long, Vice-President of Harvell-Kilgore, corroborated President Wray's version of inspection procedures.

Pursuant to Rule 12(b), Federal Rules of Civil Procedure, the motions to dismiss were treated as motions for summary judgment under Rule 56, Federal Rules of Civil Procedure, since matters outside the pleadings were presented to and accepted by the Court. After briefs by the parties, the District Court entered an order dismissing the complaint on November 13, 1968.

The initial argument that defendants propound to insulate themselves from liability is grounded in the theory of sovereign immunity. Defendants postulate that they are alter egos of the United States and that their actions are the actions of the United States duly protected from liability by the doctrine of sovereign immunity. Although hoary, sovereign immunity still retains a place in our legal scheme; however, it must be maintained in its proper place.[1]

Day & Zimmerman, Inc., present circumstances surrounding the manufacture of the grenades as well as provisions of the contract to buttress their position. Under a specified contract with the United States, appellee operated the Lone Star Army Ammunition Plant at Texarkana, Texas, a facility wholly owned by the United States, including all land, buildings, machinery and equipment. All component parts assembled to form the finished grenade were property of the Government; and as to these government furnished components, Day & Zimmerman, Inc., was required to make only a visual inspection. Assembly of the grenades rigidly followed government specifications, under active surveillance of government inspectors; and the finished grenades were packed and stored on the plant premises for disposition by the Army Officer in command of the plant area. It is contended that if any plaintiff in these cases should obtain judgment against Day & Zimmerman, Inc., the burden of satisfying such judgment would ultimately fall upon the United States, such being the design of Article VI-A[2] of the operating contract

1. Brady v. Roosevelt SS Company, 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471 (1943); Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939).

2. *Article VI-A—Responsibility of Contractor.*
It is the purpose and intent of this Contract that the Contractor shall exercise the same degree of care (unless otherwise directed by the Government) in the performance of the work hereunder as it would if the Plant to be equipped and operated belonged to the Contractor. Nevertheless, because of the hazardous nature of the work and the risks involved, it is stipulated by and between the parties hereto that:
(a) All work under this Contract is to be performed at the expense of the Government and the Government shall indemnify and hold the Contractor harmless against any loss, expense, or damage (including, without limitation, injuries to and deaths of persons or damage to property), of any kind whatsoever arising out of or connected with the performance of the work, unless such loss, expense, or damage should be shown by the Government to have been caused directly by bad faith or wilful misconduct on the part of one or more of the Contractor's corporate officers or other representatives having supervision or direction of the operation of the whole of the Contractor's business or of the whole of any plant operated by the Contractor, in the performance of this Contract, acting within the scope of his or their authority and employment.
(b) The Government recognizes that the work herein provided for is of a dangerous nature and that its accomplishment under existing conditions will be attendant with even greater risk of damage to property, injuries to persons and failures or delays in performance due to uncertain and unexpected causes than would normally exist. The Contractor is unwilling to assume said

(in brief, the contract provided that the Government shall indemnify and hold the Contractor harmless against loss—including, without limitation, injuries to and death of persons.)

However, a study of these points fails to convince the Court that Day & Zimmerman, Inc., is within the pale of sovereign immunity. The teachings of Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950), are quite influential. The *Powell* case concerned the identical plant that is presently in litigation, and many of the circumstances are similar.[3] In that case the Lone Star Ordnance Plant at Texarkana, Texas, was owned by the Government and operated under a cost-plus-a-fixed-fee contract. Most of the materials were furnished by the Government, and the finished products were shipped in accordance with government instructions on government bills of lading to military destinations, usually outside of Texas. The title to substantially all of the raw material, work in progress and finished products was in the Government. Additionally, the contract in *Powell* contained a provision as does the contract in the case at bar that the Contractor is an independent Contractor and in no wise an agent of the Government.[4] The Supreme Court concluded in its opinion:

"In these great projects built for and owned by the Government, it was almost inevitable that the new equip- ment and materials would be supplied largely by the Government and that the products would be owned and used by the Government. It was essential that the Government supervise closely the expenditures made and the specifications and standards established by it. These incidents of the program did not, however, prevent the placing of managerial responsibility upon independent contractors." See United States v. United States Cartridge Company, 198 F.2d 456 (8 Cir. 1952).

Furthermore, Day & Zimmerman, Inc., relies upon its indemnification agreement with the United States. The company argues that, since under the terms of this agreement any judgment must be paid by the United States, this suit is in reality a suit against the United States, and is barred by sovereign immunity. However, the contract contained another provision which provided that Day & Zimmerman, Inc., had an obligation to carry liability insurance. This provision, coupled with the reasoning that if sovereign immunity was intended to extend to this company there would be no necessity of an indemnity agreement, would appear to exclude Day & Zimmerman from the protection of this doctrine. The weight of the circumstances and the law does not support the ruling of the District Court and we are compelled to deny Day & Zimmerman sovereign immunity.

---

risks for the consideration herein provided. It is therefore agreed that the Contractor shall not be liable to the Government in any amount whatever for failure or delay in performance by it hereunder, or for any damage to or destruction of property or for any injury to or death of persons arising out of or in connection with the work hereunder, no matter what the cause thereof may be or may seem to be, unless same shall be shown by the Government to have been caused directly by bad faith or wilful misconduct on the part of one or more of the Contractor's corporate officers or other representatives having supervision or direction of the operation of the whole of the Contractor's business or of the whole of any plant operated by the Contractor in the performance of this Contract, acting within the scope of his or their authority and employment.

3. Although *Powell* was a Fair Labor Standards Act case, the reasoning would appear pertinent here.

4. *Article III-A—Status of Contractor.*
   It is expressly understood and agreed by the Contractor and the Government that in the performance of the work provided for in this contract, the contractor is an independent contractor and in no wise an agent of the government.

Harvell-Kilgore Corporation's attempt to invoke the principle of sovereign immunity must also be refused. Harvell-Kilgore stands in no better position than Day & Zimmerman, if not worse. Kilgore, under a contract with the Government, was the manufacturer of the fuses that were used in the grenades. Upon completion of the production, the fuse was examined by an x-ray machine prescribed and furnished by the United States which was certified as meeting the technical requirements necessary to adequately perform the testing required on this item. This was the only possible means of non-destructive testing available and was relied upon both by Kilgore and the United States. After the x-ray inspection, government inspectors detonated 125 fuses chosen at random out of each lot of 10,000 and rejected the entire lot if even one fuse was below a critical standard.

Kilgore asserts that the United States, in providing the x-ray inspection equipment and certifying its serviceability, accepted the responsibility for discovering any defective fuses and, thereby, implicitly agreed to indemnify the contractor against liability for failure by the machine to discover a defective fuse. Hence, Kilgore argues it would have an action against the United States for any recovery which might be had against it. On this reasoning Kilgore claims sovereign immunity. However, this position by this outside supplier is untenable. Kilgore was clearly an independent contractor and is not entitled to sovereign immunity. Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784. Pulaski Cab

Company v. United States, 157 F.Supp. 955, 141 Ct.Cl. 160 (Ct. of Claims, 1958).

Defendant Kilgore presents the United States Supreme Court case of Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, to support its contentions. *Feres,* supra, determined that a member of the United States Armed Forces would not have a remedy against the United States for an injury sustained incident to their service for what otherwise would be an actionable wrong. However, to forbid Whitaker's action under *Feres* would be to conclude that Kilgore was in essence a part of the United States. That case fails to aid defendant in that we have previously determined that Kilgore is an independent contractor, separate from the sovereign.

Whitaker seeks recovery against appellees under both contract and tort theories.[5] As to the contract theory, plaintiff's complaint alleges breach of implied and express warranties, and plaintiff's status as a third party beneficiary of such warranties. Under the *Erie-Klaxon*[6] doctrine, a federal court sitting as a diversity court must apply the conflicts of law rules of the forum state; in this case, Georgia. Citing Atlantic Phosphate Co. v. Ely, 82 Ga. 438, 9 S.E. 170 (1888), it is Whitaker's contention that the Georgia conflict of law rule is that the law of the place of sale should govern. Appellees-defendants do not argue the issue but present their contentions as though it is unquestioned that the Georgia law, i. e., the place of injury, is proper. This conflicts question is no small matter, and in this case will determine the outcome of the breach of warranty contention.[7] The states of Geor-

---

5. Griffith v. Chevrolet Motors Division, 105 Ga.App. 588, 125 S.E.2d 525 (1962).

6. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

7. Although all three states have enacted the Uniform Commercial Code, Georgia

is much stricter in its requirement of privity than either Texas or Tennessee. Texas has adopted the modern tendency and has abolished the privity requirement in warranty actions. Shamrock Fuel & Oil Sales Co. v. Tunks, Tex.Civ.App., 406 S.W.2d 483 (1966). Tennessee has taken a modified approach, but one that in this action would reach the same results as the Texas law. Leach v. Wiles, Tenn.App., 429 S.W.2d 823 (1968).

gia, Tennessee and Texas are involved. Georgia is the place where the injury occurred. Tennessee and Texas are the states in which Kilgore and Day & Zimmerman respectively, sold their products to the Government. The Georgia conflicts of law rule as to warranties is unclear. Whitaker's authority that Georgia would look to the place of sale does not withstand a careful study. In Atlantic Phosphate Co. v. Ely, supra, the Georgia Supreme Court was confronted with the interpretation of a state statute which required the inspection of fertilizers offered for sale or distribution in Georgia. The holding in that case was not concerned with conflicts of law and is of no aid in this action.

There is no case law stating Georgia's conflicts of law rule; however, the Uniform Commercial Code which has been enacted in Georgia does indicate that the law of Georgia should apply. Georgia Code Annotated 109A–1–105 reads:

"Except as provided hereafter in this section, when a transaction bears a reasonable relation to this State and also to another State or nation the parties may agree that the law either of this State or of such other State or nation shall govern their rights and duties. *Failing such agreement this Act applies to transactions bearing an appropriate relation -to this State.*" (Emphasis supplied).

Certainly, the transaction is appropriately related to Georgia in that Mr. Whitaker was (1) a citizen of Georgia, (2) suffered an injury in Georgia, (3) brought suit in Georgia, (4) against defendants alleged to be doing business in Georgia, and (5) pursuant to a statute of

Georgia concerning jurisdiction of nonresident defendants. The language of this Code section appears to establish in Georgia as to transaction under the Uniform Commercial Code [8] a conflicts of law rule where none existed before. The injury to Whitaker connects the transaction sufficiently to Georgia so that it bears an appropriate relationship to this State, thereby resulting in the application of Georgia law to the warranty question.[9]

■ The Georgia law as to warranties is controlled by the Uniform Commercial Code Section 2–313 through 2–318 (Georgia Code Annotated § 109A–2–313 through 2–318). The first obstacle that Whitaker must face in recovery on a breach of warranty is the law of Georgia in regard to the privity requirement. Georgia Code Annotated § 109A–2–318 provides:

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

The Uniform Commercial Code was adopted in Georgia in 1962 and since that passage there have been several cases that have reviewed the privy requirement.[10] The rule stated in Brooks v. Eastern Air Lines, Inc., 253 F.Supp. 119 (1966), is the Georgia law, viz:

"It was early decided in Georgia that in order to maintain an action against a manufacturer based on implied warranties the plaintiff must be a pur-

8. Georgia Code Annotated 109A.

9. In that a breach of warranty involving an injury is analogous to a tort action, it is reasonable to conclude that the orthodox "place of injury" rule should apply to warranties. This position supported by case law and treatise in Barlow v. De-Vilbiss Co., 214 F.Supp. 540 (1963); Conlon v. Republic Aviation Corp., 204 F.Supp. 865 (1960); Hinton v. Republic

Aviation Corp., 180 F.Supp. 31 (1959); 3 Frumer & Friedman, Product Liability § 38.04.

10. Brooks v. Eastern Air Lines, Inc., 253 F.Supp. 119 (D.C.N.D.Ga., 1966); R. H. Macy & Co., Inc. v. Vest, 111 Ga. App. 85, 140 S.E.2d 491; Wood v. Hub Motor Co., 110 Ga.App. 101, 137 S.E.2d 674.

chaser either directly from the manufacturer or from some other person such as a wholesaler or retailer."

It would appear that Georgia Code Section 109–A–2–318 has had little effect on the Georgia case law.

Whitaker is not the purchaser of the product that caused his injuries; and under the restricted view the State Courts presently have adopted on privity, he would not be a "person who is in the family or household of his buyer or who is a guest in his home." As the District Court correctly ruled, this action as to breach of warranty may not be pursued in Georgia.

■ Whitaker's second avenue of recovery is grounded in tort law. First, it is contended that the District Court was incorrect in stating that Georgia is not a strict liability state, and, second, that the tort law of simple negligence should have allowed him a trial. It is quite lucid that the Georgia conflicts of law rule is that the law of the place of injury governs in tort liability.[11] Orr v. Sasseman, 239 F.2d 182 (5 Cir., 1956); Brooks v. Eastern Air Lines, Inc., 253 F.Supp. 119 (D.C., N.D.Ga., 1966). Accordingly, the law of the place of injury i. e., Georgia, will control.

■ Strict liability is a comparatively recent legal concept having its origin in the case of Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436 (1944).[12] Although this new concept has been adopted in several states, it has not expressly been accepted in Georgia. According to the teachings of Putnam v. Erie City Manufacturing Co., 338 F.2d 911 (5th Cir., 1964), it now becomes the responsibility of this Court to predict the law by looking to " 'all available data'; * * * keeping in mind that it must 'choose the rule which it believes the state court, from all that is known about its methods of reaching decisions is likely in the future to adopt' " [13].

■ However, Georgia case law is not completely void of all references to strict liability. In Friend v. General Motors Corp. et al., 118 Ga.App. 763, 165 S.E.2d 734 (1968), Judge Pannell in his dissenting opinion stated: "Georgia is not one of the strict liability states in product liability". That case was not one which involved the strict liability doctrine, and the statement by Judge Pannell was dictum; however, the dissent was fully concurred in by two other Judges. Although not binding as law, this phrase is a guide to be used in ascertaining the movement of the Georgia law. Plaintiff Whitaker cites Georgia Code Annotated § 105–106 and its amendment [14] as perhaps the best barometer of Georgia's future action. This section allows an action in

11. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Company v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

12. An excellent annotation discussing the development of strict liability may be found in 13 A.L.R.3d 1057.

13. In *Putman*, supra the Court, after a review of the relevant factors, predicted that Texas was a strict liability state. Later the Texas Appeals Court affirmed this conclusion.

14. Georgia Code Annotated § 105–106, as amended:
    No privity is necessary to support an action for a tort; but if the tort results from the violation of a duty, itself the consequence of a contract, the right of action is confined to the parties and privies to that contract, except in cases where the party would have had a right of action for the injury done, independently of the contract, and except as provided in Code section 109A–2–318. However, the manufacture of any personal property sold as new property, either directly or through a dealer or any other person, shall be liable in tort, irrespective of privity, to any natural person who may use, consume or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended and its condition when sold is the proximate cause of the injury sustained; a manufacturer may not exclude or limit the operation hereof.

tort without the necessity of privity; and the Court is convinced that in tort actions privity is not required under Georgia law. However, the element of negligence was not disposed of by this statute, and it still is a requirement in tort suits. In 1968 Professor Hunter Taylor of the University of Georgia School of Law prepared and published in the Georgia Law Review, "Georgia's New Statutory Liability for Manufacturers: An Inadequate Legislative Response".[15] This article involved an in-depth study of Georgia Code 105–106, its background and potential effects. The conclusion reached was that Georgia Code 105–106 contains several basic flaws and should be modified before confusion results. Professor Taylor further concluded, "Because the Georgia courts have failed to implement through the judicial process a strict liability in tort theory of products liability, an approach of many other state courts, legislative action must be taken."

All of the authorities taken in their totality indicate that Georgia is not a strict tort liability state, nor is it moving in that direction. The District Court correctly ruled on this issue.

In that the question of negligence was pleaded by the Whitakers in their complaint, the District Court erred in dismissing the case for failure to state a claim. Since the defendants do not come within the coverage of sovereign immunity, they are responsible for injuries resulting from the negligent manufacture of its products, and a reading of the complaint reveals sufficient pleadings to state a cause of action.

■ An ancillary issue is raised by Kilgore who asserts that it is relieved of liability since the inspection was performed by the Government; and, if there was a defect in the fuse, the Government is responsible due to its improper inspection. In Griffith v. Chevrolet Motors Division, 105 Ga.App. 588, 125 S.E. 2d 525, the Court held that "a manufacturer who sells an article knowing that it is likely to be resold or used by other people then the buyer will be held liable for an injury to a stranger caused by a defect which might be discovered by reasonable inspections by the manufacturer." The conflicts of law rule of the forum state in tort requires that this Court use the law of Georgia, i. e., the place of injury. Georgia, as can be seen from the *Griffith* case, requires inspection of goods sold. The manufacturer is designated by the Georgia law as the one responsible for reasonable inspection and the duty that arises may not be avoided by delegation to another party. If this third party who performs the inspection carries out this duty in a negligent manner, then the manufacturer is liable. Smith v. Noxon Rug Mills, Inc., 109 Ga. App. 724, 137 S.E.2d 322, (reversed on other ground) 220 Ga. 291, 138 S.E.2d 569.

In summary, we affirm the District Court on the issues of express and implied warranties and strict tort liability. We reverse the District Court on the issues of sovereign immunity, requirement of the United States as an indispensable party, and failure of Whitaker to state a claim in simple negligence.

We affirm in part and reverse and remand in part for proceedings not inconsistent with the above.

15. 2 Georgia Law Review No. 4, p. 538.