**Robert Allen BROWN and Lola V. Brown, Appellants,**

v.

**CATERPILLAR TRACTOR COMPANY, Appellee.**

No. 81–2479.

United States Court of Appeals, Third Circuit.

Argued April 2, 1982.

Decided Dec. 28, 1982.

John M. Tighe (argued), Tarasi & Tighe, Pittsburgh, Pa., for appellants.

Edward A. McFarland (argued), Robert S. Grigsby, Carl E. Harvison, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for appellee.

Before GIBBONS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

### I. Introduction

While on weekend duty, United States Army reservist Robert Brown sustained injuries that he alleges were caused by the defective design of a tractor-bulldozer manufactured by Caterpillar Tractor Company ("Caterpillar") for the Department of the Army.[1] Brown was seated in the passenger seat of the bulldozer as it was clearing some land when a felled tree came over the bulldozer's blade and struck him. Claiming that he would not have been injured had the bulldozer been equipped with a protective structure around the passenger seat, Brown sued Caterpillar under Pennsylvania law on theories of negligence, breach of express and implied warranties, and strict liability. Caterpillar moved for summary judgment, arguing that the bulldozer was not defective as a matter of law, and that the company was insulated from suit under the "government contractor defense" because it had built the bulldozer to government specifications. In an opinion containing certain findings of fact, the district court agreed with both of Caterpillar's contentions and granted summary judgment.

Brown's appeal from summary judgment requires us to determine whether the record contains any genuine issues of material fact regarding either of Caterpillar's two contentions: (1) the absence of a defect in the bulldozer; and (2) the sufficiency of Caterpillar's compliance with the terms of the government contract and specifications. After scrutinizing the record, we conclude that there are genuine issues of material fact bearing on the validity of both contentions, and we therefore must reverse the grant of summary judgment and remand for further proceedings. We do so, however, only after addressing two threshold legal issues: (1) whether state or federal law governs this suit; and (2) the anatomy and scope of the government contractor defense under the applicable law. We conclude that state law, in this case Pennsylvania law, governs Brown's suit; that the government contractor defense exists in Pennsylvania; and that the defense is available against all of Brown's claims.

### II. The Choice Between Federal and State Law

Although the parties litigated this case under Pennsylvania law before the trial court, the question arose at oral argument in this Court whether *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), require the application of federal law.[2] Because the parties had not previously addressed this issue, we requested that they do so in supplemental briefs. After careful review of the arguments advanced in those supplemental briefs, we conclude that there is no

---

1. Jurisdiction is founded upon diversity of citizenship. *See* 28 U.S.C. § 1332 (1976).

2. Both parties continue to agree that if state law governs, it is Pennsylvania law that should be applied.

merit to Caterpillar's contention that federal law governs the adjudication of this dispute.

In *Feres,* the Supreme Court held that the United States cannot be held liable under the Federal Tort Claims Act for injuries to a serviceman if the injuries "arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159.[3] Although the Act incorporates state-created causes of action by reference, the Court found such incorporation inappropriate in the military context. In *Stencel Aero,* the Court explained the considerations that underlay its decision in *Feres:*

> First, the relationship between the Government and members of its Armed Forces is " 'distinctively federal in character' " ...; it would make little sense to have the Government's liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury. Second, the Veterans' Benefits Act establishes, as a substitute for tort liability, a statutory 'no fault' compensation scheme which provides generous pensions to injured servicemen, without regard to any negligence attributable to the Government.

431 U.S. at 671, 97 S.Ct. at 2057 (citations omitted). The *Stencel Aero* Court added that the Government's immunity from suit for injuries sustained in conjunction with military service was further justified by " '[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.' " *Id.* at 671–72, 97 S.Ct. at 2057–2058 (quoting *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 145, 99 L.Ed. 139 (1954)).

Relying upon this reading of *Feres,* the Court in *Stencel Aero* decided that the United States could not be sued under the Federal Tort Claims Act by a contractor seeking indemnification for damages paid by it to a member of the Armed Forces injured in the course of military service. First, the Court determined that "[t]he relationship between the Government and its suppliers of ordnance is certainly no less 'distinctively federal in character' than the relationship between the Government and its soldiers." *Id.* 431 U.S. at 672, 97 S.Ct. at 2058. "If, as the Court held in *Feres,* it makes no sense to permit the fortuity of the situs of the alleged negligence to affect the liability of the Government to a serviceman ..., it makes equally little sense to permit that situs to affect the Government's liability to a Government contractor for the identical injury." *Id.* Second, the Court concluded,

> it seems quite clear that where the case concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party. The litigation would take virtually the identical form in either case, and at issue would be the degree of fault, if any, on the part of the Government's agents and the effect upon the serviceman's safety. The trial would, in either case, involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions. This factor, too, weighs against permitting any recovery by petitioner against the United States.

*Id.* at 673, 97 S.Ct. at 2058.[4]

The underpinnings of *Feres* and *Stencel Aero* do not justify the application of federal law in this case. Although it may not

---

3. *Feres* was an action brought by the executrix of a serviceman who had been killed when the barracks in which he was sleeping caught fire. The complaint alleged that the United States had been negligent in quartering the decedent in barracks it knew to be unsafe due to a defective heating plant.

4. The Court also concluded that to permit the third party claim would circumvent the liability limitation provisions built into the Veterans' Benefits Act.

make sense to permit the fortuity of the situs of the alleged misfeasance to affect the government's liability, the same cannot be said of the liability of a government contractor to a serviceman. Manufacturers who market their products throughout the nation regularly face the possibility that they will be subjected to different standards of liability in different jurisdictions. Second, a suit by a serviceman against a government contractor presents no danger of circumventing the limitations on governmental liability contained in the Veteran's Benefits Act. Third, because such suits generally do not necessitate the second-guessing of military decisions envisioned in *Feres* and *Stencel Aero,* they do not pose the same threat to military discipline as do suits against the Government.

In addition, Caterpillar has raised no argument suggesting that the application of state law would pose a threat to an identifiable federal policy, nor has it cited any decision that has so held. Indeed, although a substantial number of suits have been brought by servicemen against military suppliers, in no case has federal law displaced state law,[5] and the courts of appeals in three circuits have explicitly held that state law governs such suits.[6] We agree: Pennsylvania law, not federal law, governs the case at bar.

III. The Government Contractor Defense

■ The decision to apply Pennsylvania law does not end our inquiry, for the status of the government contractor defense in Pennsylvania is far from clear. Caterpillar submits that compliance with the specifications of a government contract constitutes a complete defense, regardless of the theory on which the action is brought. Brown, however, questions the continued vitality of the government contractor defense in Pennsylvania. In particular, Brown argues that the defense is not available in an action based on strict liability or breach of warranty; alternatively, Brown contends that the defense insulates a contractor from liability only if the contractor demonstrates that it was compelled by the government to comply with the specifications responsible for causing the injuries.

As Judge Adams remarked in *Becker v. Interstate Properties,* 569 F.2d 1203, 1204 (3d Cir.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978), "[t]he task of a federal court sitting in diversity is frequently not an easy one, for it must forsake its realm of expertise and assume the aspect of a court of the forum state." For a number of reasons, we are at a particular disadvantage in this case. First, although it appears that Pennsylvania courts have recognized the government contractor defense in negligence actions, they have never addressed its applicability in the contexts of strict liability and breach of warranty. Second, there have been significant changes in the direction of Pennsylvania tort law since the Pennsylvania Supreme

**5.** *See, e.g., Boeing Airplane Co. v. Brown,* 291 F.2d 310 (9th Cir.1961); *O'Keefe v. Boeing Co.,* 335 F.Supp. 1104 (S.D.N.Y.1971).

In addition, the Supreme Court in *Day & Zimmerman v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam), relied on *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), in order to determine which state's law to apply in a suit by a serviceman against an ordnance supplier. This reliance on *Klaxon* strongly implies that state law governs all such suits.

**6.** *In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867 (8th Cir.1974); *Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir.1969).

Although not of precedential effect, the Supreme Court's denial of certiorari in the *Agent Orange* litigation merits some consideration. Before passing upon the certiorari petition, the Court invited the Solicitor General to file a brief expressing the views of the United States on the choice-of-law question. 452 U.S. 958, 101 S.Ct. 3105, 69 L.Ed.2d 969 (1981). At page nine of his responding brief, the Solicitor General argued against application of federal law: "In the judgment of those charged with administering the nation's military and veterans' affairs, the federal interests involved here are not sufficiently unique and pressing to warrant the conclusion that 'there exists 'a significant conflict between some federal policy or interest and the use of state law.'' " About one month later, the Court denied the petition for writ of certiorari.

Court first announced the availability of the government contractor defense. Finally, the limited number of situations in which the Pennsylvania courts have examined the government contractor defense have not sufficiently defined its contours.

Under these circumstances, we must predict how Pennsylvania courts would decide these issues. *See Barris v. Bob's Drag Chutes & Safety Equipment, Inc.*, 685 F.2d 94, 98 (3d Cir.1982). To do so, we consider the policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

First enunciated by the Pennsylvania Supreme Court in *Ference v. Booth & Flinn Co.*, 370 Pa. 400, 88 A.2d 413 (1952), the government contractor defense was more fully explored in *Valley Forge Gardens, Inc. v. James D. Morrissey, Inc.*, 385 Pa. 477, 123 A.2d 888 (1956). *Valley Forge Gardens* offered two justifications for the defense.[7] The court first reasoned that, although a government contractor does not enjoy the state's sovereign immunity, "if the contractor, in privity with the State or its instrumentality, performs the contract work which the State is privileged to have done, the privilege operates to relieve the contractor from liability to third persons ex-

cept for negligence or willful tort in performance of the work." *Id.* at 483–84; 123 A.2d at 891.[8] This "privilege" rationale echoes the United States Supreme Court's reasoning in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 20–21, 60 S.Ct. 413, 414, 84 L.Ed. 554 (1940), in which the Court held that a federal contractor was not liable for injuries resulting from work done pursuant to government contract: the authority to perform the work had been validly conferred, and the contractor was not liable for executing the government's will.

Second, *Valley Forge Gardens* offered an "efficiency" rationale—i.e., that the government contractor defense is essential to the smooth and predictable operation of government procurement programs:

> [I]f the rule were otherwise, 'the bidding on contracts with a [governmental instrumentality] would be somewhat hazardous, because the contractor could never know what the amount of damages which he might have to pay to abutting property [sic] would be.' Also, ... '[t]he contractor's bid is based upon the theory that the public agency has a legal right to submit its plans and specifications for the work to be performed, and that if [the contractor] performs the work in accordance with the plans and specifications he will incur no liability in the absence of negligence.'

385 Pa. at 484, 123 A.2d at 891–92 (citations omitted).[9]

---

7. Although both *Valley Forge Gardens* and *Ference* involved claims against a state contractor, we have no doubt that the cases have equal force with regard to the liability of a federal contractor.

8. Although the Court's language could be interpreted to mean that the government contractor defense is available only when the underlying cause of action is *not* based on negligence, the more plausible reading of *Valley Forge Gardens* and *Ference* is that a government contractor would not be immune if he negligently deviated from the specifications.

9. Other jurisdictions have invoked other rationales in support of the defense. Some courts have reasoned that the defense is necessary in order to reduce the government's costs in ob-

taining goods and services. *See, e.g. Dolphin Gardens, Inc. v. United States*, 243 F.Supp. 824, 827 (D.Conn.1965); *Hunt v. Blasius*, 55 Ill. App.3d 14, 12 Ill.Dec. 813, 817–818, 370 N.E.2d 617, 621–22 (1977), *aff'd on other grounds*, 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368 (1978). One court has suggested that the defense is akin to vicarious sovereign immunity. *See Green v. ICI America, Inc.*, 362 F.Supp. 1263, 1265 (E.D.Tenn.1973). Another court has reasoned that the defense is an offshoot of military necessity if the contractor is a military supplier in time of war. *See Casabianca v. Casabianca*, 104 Misc.2d 348, 428 N.Y.S.2d 400 (Sup.Ct.1980). *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762, 793 (E.D. N.Y.1980), theorized that the defense recognizes that holding the contractor liable serves

Two recent developments in Pennsylvania law might be thought to sap the vitality of the government contractor defense, particularly as it applies to strict liability and warranty claims.[10] The first development is the Pennsylvania Supreme Court's abrogation of the doctrine of sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). At first blush, the decision of Pennsylvania's highest court to expose the state itself to liability would seem to undercut a government contractor's claim to an immunity that is derived from the government's privilege. But *Valley Forge Gardens* made explicit that the privilege there described is distinct from the state's sovereign immunity; hence the Commonwealth's decision to expose itself to liability does not necessarily mean that it would also so expose its contractors.

Another development—or, more accurately, series of developments—cautions hesitation in the extension of the government contractor defense to strict liability or warranty claims. Since *Ference* and *Valley Forge Gardens,* Pennsylvania has adopted the Restatement (Second) of Torts § 402A,[11] *see Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), and its courts have applied § 402A in a way that characterizes Pennsylvania as a "liberal" state in its construction of strict liability doctrine. *See Bruffett v. Warner Communications, Inc.,* 692

F.2d 910 at 922 (3d Cir.1982) (Gibbons, J., dissenting) ("[T]he Supreme Court of Pennsylvania in recent years has in many areas of the law been a leader in adopting reforms in the common law."). In *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974), for example, the Pennsylvania Supreme Court ruled that a manufacturer of a product "is effectively the guarantor of his products' safety," and in *Azzarello v. Black Brothers Co.,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978), the Court held that "the term 'unreasonably dangerous' has no place" in jury instructions in a design defect case. Moreover, *Azzarello* made clear that the primary justification for imposing liability for defective products upon suppliers is risk spreading. *Id.* at 553, 391 A.2d at 1023–24. Brown argues that these developments in Pennsylvania tort law should lead to the imposition of liability upon the supplier of a defective product whether or not the government demanded the item in its defective state. He observes that any supplier could respond to the prospect of such liability by raising his bid or seeking indemnification from the government in order to cover the cost of the risk.

Although the question is close, we believe that Pennsylvania would retain the government contractor defense notwithstanding these intervening developments in its tort law. We draw this conclusion for several

no deterrent effect when the government is the responsible party.

**10.** In its only other opinion on the government contractor defense, *Lobozzo v. Adam Eidemiller, Inc.,* 437 Pa. 360, 263 A.2d 432 (1970), the Pennsylvania Supreme Court held that the rule of *Valley Forge Gardens* did not apply to a case involving injuries caused by blasting, which the court classified as an ultrahazardous activity. In so holding, the court reformulated the government contractor defense so that it "applies in the absence of negligence, willfully tortious conduct, or activities, such as blasting, for which liability without fault is imposed." *Id.* at 365, 263 A.2d at 435. We do not think that *Lobozzo* stands for more than the proposition that the defense is ineffective against a claim for injuries arising out of an ultrahazardous activity.

**11.** Section 402A states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965).

reasons. First, the Pennsylvania Supreme Court did reaffirm the viability of the government contractor defense in 1970, *see supra* note 10, and we are reluctant to say that the defense has been abandoned after such a recent suggestion to the contrary.

Second, the weight of common law authority supports retention of the defense. Although no Pennsylvania court has reached the issue, a substantial number of other state and federal courts have recently held that the government contractor defense applies to strict liability claims. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046, 1054–56 & n. 1 (E.D.N.Y.1982); *Ross v. M.R.C. Corp.,* No. 78–956, slip op. at 5–7 (W.D.Pa. August 4, 1980) (Pennsylvania law), *aff'd mem.,* 642 F.2d 443 (3d Cir.1981); *Hunt v. Blasius, supra* note 9; *McCabe Powers Body Co. v. Sharp,* 594 S.W.2d 592 (Ky.1980); *Sanner v. Ford Motor Co.,* 144 N.J.Super. 1, 364 A.2d 43 (1976), *aff'd,* 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied,* 75 N.J. 616, 384 A.2d 846 (1978); *Casabianca v. Casabianca, supra* note 9. All of these courts have concluded that the justifications for the defense in the negligence context apply with equal force in the context of a strict liability claim.[12] Finally, we expect that the recent spate of proposed products liability legislation, most of which incorporates the government contractor defense,[13] would persuade the Pennsylvania Supreme Court of the defense's continued viability.

We also believe that Pennsylvania law would make the defense available in the strict liability context. As noted above, the weight of authority in other jurisdictions, as well as the tenor of recent and proposed legislation, so suggests. Such a conclusion also accords with the Pennsylvania Supreme Court's "privilege" and "efficiency" rationales. If Pennsylvania's public policy

12. To the extent that the recent developments discussed in the text may have undercut the rationales advanced in *Valley Forge Gardens,* we believe that the Pennsylvania Supreme Court is likely to adopt the justifications for the defense that have been advanced by other courts, *see supra* note 9.

13. In particular, the United States Department of Commerce Task Force on Product Liability, under the chairmanship of Professor Victor E. Schwartz, has promulgated a Uniform Product Liability Law, *reprinted at* 44 Fed.Reg. 62714 (1979), which codifies the government contractor defense at section 108:

   *Sec. 108. Relevance of Legislative or Administrative Regulatory Standards and Mandatory Government Contract Specifications*
   . . . .
   (C) When the injury-causing aspect of the product was, at the time of manufacture, in compliance with a mandatory government contract specification relating to design, this shall be an absolute defense and the product shall be deemed not defective under Subsection 104(B), or, if the specification related to warnings or instructions, under Subsection 104(C) or 105(A).
   (D) When the injury-causing aspect of the product was not, at the time of manufacture, in compliance with a mandatory government contract specification relating to design, the product shall be deemed defective under Subsection 104(B), or, if the specification related to warnings or instructions, under Subsection 104(C) or 105(A).
The analysis following § 108 states:

Subsection (C) addresses a highly specialized problem with respect to a product that had been manufactured strictly in accordance with mandatory specifications set forth in a government contract. When compliance with such a standard leads to an injury, the government, not the product seller, is the appropriate defendant. As the court in *Hunt v. Blasius,* 55 Ill.App.3d 14, 12 Ill.Dec. 813, 817–818, 370 N.E.2d 617, 621–22 (1977), indicated, 'public policy dictates that bidders who comply strictly with governmental specifications should be shielded from liability in any respect in which the product complies.' When enacting this provision, a legislature should ensure that its own state government bears financial responsibility (either through tort law or through a compensation system) for the harm it has caused by directing that the product conform to contract specifications.
   Subsection (D) provides a counterweight to Subsection (C). If the bidder fails to comply with a mandatory government contract specification, and this failure to comply caused the claimant's injury, the product seller will [sic] deemed liable under Subsection 104(B) if the specification related to design, or under Subsection 104(C) or 105(A) of [sic] the specification related to instruction or warnings. If the manufacturer's compliance exceeded the government regulation and the product failed, liability should not be imposed under this Section—in that case, the technical 'failure to comply' would not be the proximate cause of the injury that befell claimant.

dictates that the contractor should enjoy or share the government's "privilege," he should do so regardless of the plaintiff's theory of liability. In addition, to the extent that the defense lessens disruption of government procurement operations by enabling contractors to assess their costs accurately and by encouraging them to bid for government contracts, it is no less disruptive for contractors to be exposed to strict liability, particularly when, as a practical matter, most products liability suits are brought on multiple theories.

■ Although these considerations lead us to conclude that the defense is also applicable to claims based on breach of warranty,[14] we add an important caveat: we do not believe that a contractor's performance in accordance with the government's specifications would be a defense if the goods furnished to the government were themselves defective. For example, in *General State Authority v. Coleman Cable & Wire Co.,* 27 Pa.Commw. 385, 365 A.2d 1347 (1976), the court ruled that a contractor could not be held in breach of warranty for supplying a certain kind of cable pursuant to a government contract, but that the contractor *could* be held liable for breach of warranty if the cable itself breached any pertinent warranties. This approach is consistent with *Ference* and *Valley Forge Gardens.* Although both cases held that, in the context of a negligence action, the contractor is insulated from liability when he has acted in accordance with the contractual specifications, both also stated that the contractor is *not* so shielded when he has performed negligently or in a willfully tortious manner.[15]

■ Brown argues that there is another, more restrictive limitation on the availability of the government contractor defense. Invoking *Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co.,* 295 F.2d 14 (9th Cir. 1961), and *Sanner v. Ford Motor Co., supra,* 144 N.J.Super. p. 14, 364 A.2d 43, Brown contends that Caterpillar cannot avail itself of the defense unless it can show "compulsion," i.e., that it had no discretion in designing the bulldozer and was compelled to build it in the manner specified by the government. Brown also argues that the defense is not available if Caterpillar had been able to suggest modifications in or additions to the bulldozer's design at any time before final delivery. Caterpillar, however, submits that compulsion plays no role in the government contractor defense, and that the company had no obligation beyond strict compliance with the government's specifications.

Caterpillar's argument seems to accord with existing Pennsylvania case law. Neither *Ference* nor *Valley Forge Gardens* mentions compulsion, much less refers to it as an element of the government contractor defense. Indeed *Valley Forge Gardens* makes quite clear that the key to a successful defense is strict compliance with the government contract. *See supra* pp. 250–251. At the same time, Caterpillar's approach fails to take into account the different types of situations in which the defense is invoked. Some government contracts, for example, involve comprehensive and detailed specifications. Others, however, contain rather sketchy specifications that neither require nor preclude a particular safety device. Under Caterpillar's approach, as long as the safety device is not mentioned in the specifications, the manufacturer or seller can invoke compliance as a defense

---

**14.** We are again influenced by similar conclusions of courts in other jurisdictions, *see, e.g., In re "Agent Orange" Product Liability Litigation, supra,* 534 F.Supp. at 1055–56; *Casabianca v. Casabianca, supra* note 9, as well as the Uniform Law's recognition of this defense in this context, *see* Uniform Product Liability Law, *supra* note 13, § 102(D), 44 Fed.Reg. at 62717 (defining "product liability claims" to include breach of express or implied warranty). We also note the practical similarity between

§ 402A claims and breach of warranty claims under Pennsylvania law. *See Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 319 A.2d 903 (1974); *MacDougall v. Ford Motor Co.,* 214 Pa.Super. 384, 388, 257 A.2d 676, 678 (1969).

**15.** This limitation also suggests that, in the strict liability context, Pennsylvania would recognize the government contractor defense for claims of defective design but not for claims of defective manufacture.

against liability for injury caused by the device's absence, even if installing the device would cost pennies and eliminate a risk known to be high. Moreover, Caterpillar's argument ignores the fact that many government contracts are negotiated, rather than bid on a "take it or leave it" basis.[16] Although the government undoubtedly enjoys the greater bargaining power in such situations, *see United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 887, 25 L.Ed.2d 224 (1970), there is certainly opportunity for input by the contractor.

If we were writing on a clean slate, or were ourselves fashioning the law of Pennsylvania, we might well be persuaded that a contractor must prove some degree of compulsion in order to successfully raise the government contractor defense.[17] We are, however, constrained by existing Pennsylvania law, and it would be inappropriate at this juncture for us to include a compulsion element on such a speculative basis. The law of the Commonwealth, as it now stands, places no greater obligation on a contractor than to execute the government's specifications "carefully." *See Patraka v. Armco*

*Steel Co.,* 495 F.Supp. 1013, 1020 (M.D.Pa. 1980). We therefore apply the defense as enunciated in *Ference* and *Valley Forge Gardens;* we now turn to the application of that defense to the facts of this case.

## IV. The Grant of Summary Judgment

The district court determined that summary judgment for Caterpillar was appropriate because, in its view: (1) the facts bearing on the absence of a defect were undisputed, and the bulldozer was not defective as a matter of law; (2) no warnings were required by law or by the contract; and (3) Caterpillar had complied with the government's specifications and was thereby insulated from liability.

In reaching these conclusions, the district court made several findings of fact. *Brown v. Caterpillar Tractor Co.,* No. 80–1147, slip op. at 2–4 (W.D.Pa. July 17, 1981). First, the court found that the contract between Caterpillar and the United States did not require a canopy or other overhead protective structure; to the contrary, the court found that the prescribed test method, requiring the "mount[ing] of Government-loaned canopy and engine guards," implied

16. In 1980, "85–90% of all federal contract dollars ... were let through negotiated procurements." Comment, *Requests for Proposals in State Government Procurement,* 130 U.Pa.L.Rev. 179, 181 (1981) (citing Commission on Government Procurement, 1 *Report of the Commission on Government Procurement* 20 & n. 25 (1971)).

17. We are particularly troubled by the scenario in which the specifications are skeletal, the contract is negotiated, and the contractor, knowing of a high risk of serious harm, fails to install a relatively inexpensive safety device. We therefore find appealing the Uniform Law's reference to "compliance with a mandatory government contract specification." Uniform Product Liability Law, *supra* note 13, § 108(C), 44 Fed.Reg. at 62730.

We also find attractive the novel approach adopted by Judge Pratt in *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y.1982). Responding to plaintiffs' contention that the manufacturing chemists possessed greater knowledge of Agent Orange's toxic properties than did the government, Judge Pratt formulated the government contractor defense as follows:

A supplier ... has a duty to inform the military of known risks attendant to a particular weapon that it supplies, so as to provide

the military with at least an opportunity fairly to balance the weapon's risks and benefits.... [T]he court ... concludes that a defendant in this case will be entitled to judgment dismissing all claims against it based on that defendant's having supplied "Agent Orange" to the government pursuant to a contract, if the defendant proves:

1. That the government established the specifications for "Agent Orange";

2. That the "Agent Orange" manufactured by the defendant met the government's specifications in all material respects; and

3. That the government knew as much as or more than the defendant about the hazards to people that accompanied use of "Agent Orange."

*Id.* at 1055. *See also* Note, *Liability of a Manufacturer for Products Defectively Designed by the Government,* 23 B.C.L.Rev. 1025 (1982) (arguing that the "government contract defense" is overly broad because it provides no incentive for contractors to avoid reckless conduct).

The record does not suggest, however, that we are faced in this case with either the above-described scenario or the situation envisioned by Judge Pratt.

that the specifications did not call for the bulldozer to have its own canopy. The court buttressed its conclusion with a reference to a government specification that protective devices were not to impair the bulldozer's "operating functions"; the district court stated that "a canopy would have impaired the military operation and functions of the [bulldozer] by restricting the operator's field of view." *Id.* at 3. Finally, the district court focused upon a specification that a rifle case be mounted on the bulldozer.

> The fact that the tractor was to be supplied with a rifle case indicates the Government's desire to use the tractor for Military applications and in particular for the Vietnam war, a conflict which was in progress during the time period pertinent to this contract. The need for the rifle case is a clear indication that the Government did not desire a canopy on a tractor. Such a canopy would have interfered with the military operation and function of the tractor.

*Id.* In short, the court found that "the Government knew of the dangers involved and did not specify the need or the desire for a canopy except at the Government's insistence." *Id.* at 2. The court thus concluded that the absence of a defect was undisputed and that the bulldozer was not defective as a matter of law. Having reached that conclusion, the court found that neither the law nor the contract required any warning that the bulldozer was unsafe if operated without a canopy. Finally, the court found that Caterpillar had complied with the specifications and was thereby insulated from liability.

Brown contends that it was improper for the district court to have made these findings on a motion for summary judgment, and that the judgment should be reversed because there are disputed issues of material fact regarding the existence of a defect, the requirements of the contract, and Caterpillar's compliance with the specifications. To support his argument, Brown relies on answers to interrogatories, various admissions, three exhibits allegedly showing that Caterpillar participated in designing the bulldozer (or at least had discretion to change certain features), and the affidavit of his expert in civil engineering, Dr. James P. Romualdi.[18]

Applying the standards for summary judgment previously enunciated by this Court,[19] we agree with Brown that summary judgment was inappropriate in this case.

■ Turning first to the question whether the bulldozer was defective, we hold that Brown's contentions regarding the bulldozer's defects and inadequate warnings[20] were not so obviously baseless that the district judge should have made findings of fact to the contrary and taken the issues from the jury. Brown alleges that he was injured as a result of Caterpillar's failure both to equip the bulldozer with a protective structure around the passenger seat and to warn of the dangers involved in operating the bulldozer without such a protective structure. These allegations were supported by Dr. Romualdi's affidavit, which concluded that the absence of both a protective structure and a warning not only

---

**18.** Caterpillar submitted no affidavits with its motion for summary judgment, but relied instead upon the pleadings, answers to interrogatories, admissions, and depositions. These papers included the contract.

**19.** Fed.R.Civ.P. 56(c) permits summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden of demonstrating the absence of all genuine issues of material fact rests on the moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157,

90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); all inferences from the evidence must be drawn in favor of the party opposing the motion, *Small v. Seldows Stationery,* 617 F.2d 992 (3d Cir. 1980); and summary judgment may not be granted if there is "the slightest doubt" about material facts, *Tomalewski v. State Farm Life Insurance Co.,* 494 F.2d 882, 884 (3d Cir.1974).

**20.** Under Pennsylvania law, either defective design or the absence of a warning may be sufficient to support a finding that a product is defective. *Greiner v. Volkswagenwerk Aktiengeselleschaft,* 540 F.2d 85 (3d Cir.1976).

rendered the bulldozer unsafe for use in land-clearing operations but also directly caused Brown's injury.[21]

We reach the same conclusion regarding the question whether Caterpillar's contract performance was sufficient to entitle it to successfully invoke the government contractor defense. Relying solely on the contract—a veritable tome of technical specifications, bidding notices, and communications between the government and Caterpillar—the district court found that the parties neither intended nor understood a protective structure to be required.

We do not agree that the contract so unambiguously reveals the parties' intent. Brown suggests that the contract's reference to a government-loaned canopy for testing purposes is probative of the parties' awareness that such a protective structure was necessary for some uses. In addition, Dr. Romualdi's affidavit suggests that the bulldozer did not satisfy the government's specifications in two respects. First, he stated that the specifications required the bulldozer to be safe for use but that the absence of a protective structure precluded compliance with that requirement. Second, he opined that Caterpillar's failure to warn that the bulldozer could not be used safely in land-clearing operations violated the specification that the bulldozer "shall be equipped with instruction plates or diagrams, including warnings or cautions, describing any special or important procedure

to be following in assembling, operating, or servicing the [bulldozer]."

Although Dr. Romualdi's interpretation of the contract is inadmissible, *see supra* note 21, our independent review of the contract suggests that the construction advocated by Caterpillar and adopted by the district court does not necessarily follow as a matter of fact. Summary judgment was thus inappropriate. "If the non-moving party presents us with a reasonable reading of the contract which varies from that adopted by the district court, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Landtect Corp. v. State Mutual Life Assurance Co.*, 605 F.2d 75, 80 (3d Cir.1979).

We do not suggest that the district court's conclusions were incorrect. We only hold that the contract, on its face, does not reveal the intent of the parties, and we are not prepared to say that the voluminous and largely unfocused contract documents, coupled with the ongoing dealings between Caterpillar and the Army, leave no room for argument that a protective structure was required.[22] The question on a motion for summary judgment is not what the facts may be, but simply whether any disputed material facts exist. As this court stated in *DeLong Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1138 n. 2 (3d Cir.1980) (citations omitted), "Even though a district court's statement of the undisputed facts may be helpful to a reviewing court, . . . it is not appropriate for a district court to

---

21. Dr. Romualdi's opinion was based on his review of the contractual documents between Caterpillar and the United States, Caterpillar's responses to Brown's request for admissions, and Brown's deposition, as well as Dr. Romualdi's inspection of the bulldozer and the scene of the accident. Although we disregard the portion of the affidavit containing legal conclusions, Dr. Romualdi's opinions about design safety are admissible, *See Knight v. Otis Elevator Co.*, 596 F.2d 84, 87–88 (3d Cir.1979), as are his opinions about causation, *see Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 276–77 (8th Cir.1978). "[W]here . . . affidavits are submitted to oppose the grant of summary judgment, opinion evidence is appropriately considered to support the existence of a disputed issue of fact." *Paton v. LaPrade*, 524 F.2d 862, 871 (3d Cir.1975).

22. In concluding that the contract did not call for a protective canopy, the district court also found, without support in the record, that such a structure would have impaired the bulldozer's use in military maneuvers. The court's reliance on this finding also suggests that summary judgment was inappropriate. "Although the interpretation of a written contract that is clear and unambiguous is for the court, . . . once the court determines that [extrinsic] evidence is pertinent to the construction of an ambiguous contract; [sic] it is for the jury to resolve the ambiguities and find the parties' intent." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir.1979) (en banc) (citations omitted).

resolve conflicting issues of material fact on a motion for summary judgment.... Thus, a district court does not engage in fact-finding, within the meaning of [Fed.R. Civ.P.] 52, on a motion for summary judgment." Brown had demanded a jury in this case, and, to the extent that the parties' versions of the facts conflicted, resolution of that dispute was for the jury, not the court.

The district court's grant of summary judgment will be vacated and this case will be remanded for further proceedings consistent with this opinion.