**Joanna REIVER, Plaintiff,**

v.

**MURDOCH & WALSH, P.A.,
Defendant.**

**Civ. A. No. 83–560 CMW.**

United States District Court,
D. Delaware.

Jan. 7, 1985.

Carl Schnee and James P. Dalle Pazze of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del. (Alice Ballard of Samuel & Ballard, Philadelphia, Pa., of counsel), for plaintiff.

Sheldon N. Sandler of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This is an action brought by a former employee, an attorney, against her employer, a professional corporation providing legal services. The plaintiff alleges that the defendant breached its written employment contract with the plaintiff in failing to pay her a mandatory bonus and in terminating her employment "for cause" when no cause for termination in fact existed. The plaintiff also claims her removal from the board of directors and her subsequent termination were discriminatory practices based on plaintiff's sex and her condition of pregnancy.

The defendant has moved for partial summary judgment on several grounds. With respect to the discrimination claim

under federal law, defendant contends that plaintiff was not an employee within the meaning of Title VII at the time of her removal from the board of directors, and thus, is not entitled to protection under federal law for that aspect of her discrimination claim. The defendant also seeks summary judgment with respect to certain parts of the contract claims which are before the Court based on diversity of citizenship among the parties. Defendant challenges three different aspects of the contract claims: plaintiff's measure of damages, her entitlement to recover the bonus she was originally due but that was purportedly surrendered under duress, and the plaintiff's right to recover punitive and general compensatory damages for breach of contract.

FACTS

Given the acrimonious events that led to this lawsuit, it is remarkable, to say the least, that the underlying facts are relatively free from dispute. To be sure, each party has its own interpretation of these facts and discovery is not complete, but both the depositions of the plaintiff and her husband and the defendant's response to interrogatories form a coherent narrative, agreeing as to basic events and conversations among the parties. Thus, the ultimate resolution of this case will depend on the inferences to be drawn from facts already known and on evidence that is derived from any remaining discovery. Against this background, the Court offers the following summary of facts, not as a definitive interpretation of events, but as a necessary predicate to evaluating defendant's Motion for Partial Summary Judgment.

Joanna Reiver began her career as an attorney working for Murdoch & Walsh, P.A. in May of 1976. Four years later, she was invited to become a shareholder, director and officer of the professional corporation. Shortly thereafter, the plaintiff began to experience personality clashes with one of two senior directors, Converse Murdoch, with whom she shared the same area of legal specialization, estate administration and planning. Converse Murdoch, as a senior attorney and as the attorney whose name appears in the corporation's masthead, brought in much, if not most, of the work generated in the estates area. Reiver was disappointed that she did not receive more estate planning work from Murdoch rather than the estate administration work she did receive. Reiver on several occasions confronted Murdoch with her dissatisfaction. By the end of 1981, the tension between Murdoch and Reiver had become apparent to other directors. The Executive Committee of the firm, consisting of three other directors, intervened to mediate the situation. But as so often happens in such situations, the effect of the meeting was only to intensify Reiver's feelings of dissatisfaction.

Shortly thereafter, another crisis broke out among the directorship that was to lead to Reiver's estrangement with other directors. In the summer of 1981, the corporation had adopted a mandatory compensation scheme that provided a rigid formula for calculating bonuses. By the beginning of 1982, it was apparent that Reiver would receive a larger bonus than any of her colleagues, and that some directors of comparable seniority would receive no bonus at all. Her colleagues, including her soon to be husband, whether with or without justification, felt that the mandatory compensation scheme had produced an unfair distortion in earnings among directors.

By March of 1982, all of the partners except Reiver announced they would willingly scrap the bonus system. About this time, Reiver and another director, Bob Schlusser, announced they were to be married in July. Matters came to a head in the last week of March when Thomas, one of the junior directors, suggested to Reiver that looking for another job might be useful whether or not she intended to leave the firm, and Walsh, a senior director, informed Schlusser that the situation with respect to Reiver had become almost "irretrievable." Finally, Reiver consented to opt out of the mandatory compensation

scheme and was given a reduced but nevertheless substantial bonus of $25,000.

The situation appeared to cool down until after Reiver's and Schlusser's marriage. By late summer of 1982, the firm began to experience a significant cash flow problem with three directors' billings down substantially: Schlusser, Reiver and Walsh. At a meeting in mid-September, Walsh agreed to forego his salary temporarily, but Schlusser and Reiver maintained that they were receiving inadequate amounts of work. Some directors did not feel Reiver was being forthright because of her failure to attend to matters they had referred to her.

On October 4, 1982, the directors, with the exceptions of Reiver and Schlusser, gathered to consider the removal of Reiver from the board of directors. It was at this time, that the directors as a whole were apprised of the fact that Reiver was pregnant. The motion to remove did not carry. An unsuccessful effort was made to enlist the aid of Schlusser, who was then Reiver's husband, to get Reiver to resign. Within two days, another meeting was held for the same purpose with the same participants and once again, the meeting reached an inconclusive result. Immediately following the meeting, Murdoch submitted his resignation to the firm's other senior director, Walsh, with the clear meaning that either Reiver would be removed or he would leave. The letter of resignation was followed a short time later with a memorandum written by Murdoch, circulated to the directors who had attended the previous meeting. The letter presented various proposals for managing the firm.

On October 11, 1982, events moved into the final phase. Reiver and Schlusser were informed of a meeting. The meeting, to their surprise, was procedurally characterized as a shareholders meeting rather than the more common format for meetings, namely, a directors' meeting.[1] A new slate of directors for the corporation was proposed that retained the existing directors with the exception of Reiver. The new slate was elected and, thus, Reiver was removed from the board of directors.

During the next month, the directors held additional meetings concerning Reiver's employment status. Early in November, Reiver submitted a memorandum to the Executive Committee demanding additional compensation in accordance with her interpretation of an earlier compensation agreement. The next day, November 9th, Schlusser resigned from Murdoch & Walsh. Within ten days, the directors of Murdoch & Walsh decided to terminate Reiver. Late in the afternoon on November 19, Reiver was confronted in her office and given a note informing her that Murdoch & Walsh was terminating her employment with the firm effective immediately. The note was signed by all the directors. She was told to vacate the premises and the locks to all the offices were immediately changed.

DISCUSSION

## I. THE APPLICABLE STANDARD FOR SUMMARY JUDGMENT

Summary judgment offers a method to avoid the costly and cumbersome procedure of a trial whenever a formal trial is unnecessary or useless because there is no genuine issue of material fact among the parties. Thus, the principal inquiry made by the Court on a motion for summary judgment is into the existence of a genuine issue of material fact. *Peterson v. Lehigh Valley District Council, United Brotherhood of Carpenters and Joiners*, 676 F.2d 81, 84 (3d Cir.1982). No issue of material fact exists, if after drawing all inferences from the existing record in a light most favorable to the non-moving party, either the moving party is entitled to judgment as a matter of law, *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), or alternatively, the non-moving party's claims fail to establish a prima facie claim or defense. *See In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 258 (3d Cir.1983).

---

1. Prior to Reiver's removal from the board of directors and following her termination of employment, the directors of the firm were the only owners of stock.

■ Attempts to rely solely on allegations contained in the formal pleadings to raise a disputed issue of material fact will not be sufficient to withstand summary judgment, *see Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), unless the moving party fails to carry its burden demonstrating the non-existence of a disputed issue of material fact. *See Spirides v. Reinhardt*, 613 F.2d 826, 833 (D.C.Cir. 1979). The "slightest doubt," however, as to a material fact precludes summary judgment. *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 255 n. 19 (3d Cir.1982) *(citing Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir.1974)).

■ Consideration of defendant's Motion for Summary Judgment is complicated in this instance by the fact that depositions of the major participants have been postponed pending the Court's decision. The Court can only speculate what additional facts may come to light. Plaintiff's contention that evidence of disputed issues of material facts as to some of defendant's claims could emerge from subsequent depositions is a factor that militates against the Court's granting defendant's motion. *See Sames v. Gable*, 732 F.2d 49, 52 (3d Cir. 1984) (holding that district court erred in "grant[ing] defendant's motion for summary judgment while a pertinent discovery request [was] outstanding.").[2] Of course, if the record is sufficiently complete without additional discovery, then there is no requirement that summary judgment be postponed pending the completion of discovery. *See Wolk v. Saks Fifth Avenue, Inc.*, 728 F.2d 221, 224 (3d Cir.1984); *Mid-*

*South Grizzlies v. National Football League*, 720 F.2d 772, 781 (3d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984).

## II. THE APPLICABILITY OF TITLE VII TO DIRECTORS OF PROFESSIONAL CORPORATIONS

Section 703(a) of Title VII, 42 U.S.C. § 2000-e-2(a), makes the discharge or demotion of an employee because of that individual's gender unlawful.[3] Although Reiver's removal from the board of directors and one month later the termination of her employment contract allegedly represent an unlawful pattern of conduct, Reiver claims that each incident represents an independent violation of Title VII. The plaintiff seeks to establish liability for each incident on the theory she is a victim of "disparate treatment," that is, she has been treated less favorably than male employees as a result of the defendant's intent to discriminate. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (explaining liability under Title VII for disparate treatment).

The defendant concedes that the discrimination claim with respect to Reiver's termination raises a triable issue of fact. Thus, the sole issue at this stage of the proceedings is defendant's contention that, as a matter of law, a director of a professional corporation, who functions analogously to a partner in a legal partnership, removed from the board of directors for whatever reason cannot state a cause of action under Title VII against the professional corporation for her removal.[4]

---

**2.** A preferable practice for the non-moving party to follow when discovery is incomplete and pertinent facts are in possession of the moving party, is to file a motion for a continuance with respect to the summary judgment motion in order to complete the necessary discovery. Requests for such a continuance are to be granted as a matter of course. *Costlow v. United States*, 552 F.2d 560, 564 (3d Cir.1977).

**3.** Similarly, Congress enacted the Pregnancy Discrimination Act in 1978 to make discharge or

demotion based on an employee's condition of pregnancy unlawful. Pub.L. 95–555, 92 Stat. 2076 (amending 42 U.S.C. § 2000(e)).

**4.** Whether plaintiff has succeeded in establishing a prima facie case is not in issue at this time. A determination against plaintiff's claims based on the meager record before the Court would be inappropriate at this state of the proceedings with so much discovery still pending. *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir.1984). "The burden of establishing a prima facie case

The Court, in essence, is called upon to decide a variant of an issue left unresolved in *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). There, the Supreme Court held that an associate alleging that she had been discriminated against in consideration for a partnership stated a cause of action under Title VII. The Court's holding, however, rested exclusively on its findings that an associate was an employee within the meaning of Title VII and consideration for partnership was a term of employment for purposes of 42 U.S.C. § 2000e–2(a)(1). Justice Powell wrote a separate concurrence to emphasize that the Court had not held that Title VII applied to decisions among partners *inter se. Id.,* 467 U.S., at ——, 104 S.Ct. at 2236 (1984) (Powell, J. concurring). The majority opinion in *Hishon,* however, does not preclude such a result either.

Whether a partner is an employee, and analogously whether a director of a professional corporation is an employee, within the meaning of § 701(f) of Title VII (42 U.S.C. § 2000e(f)) is an issue of statutory construction. Neither the language, nor the legislative history indicate an express intent to exclude directors or partners from protection against discrimination. This fact is significant in light of the Supreme Court's directive to district courts to "avoid interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate." *County of Washington v. Gunther,* 452 U.S. 161, 178, 101 S.Ct. 2242, 2252, 68 L.Ed.2d 751 (1981). In practice, Congress has manifested its intent to create exemptions to Title VII through explicit exceptions within the statute. Thus, unlike partnerships or professional corporations, certain private

membership clubs, 42 U.S.C. § 2000e(b)(2), religious corporations, associations, educational institutions, or societies, 42 U.S.C. § 2000e–1, and employers with less than 15 employees, 42 U.S.C. § 2000e(b), are expressly excluded from the prohibitions of Title VII with respect to employment. Indeed, in amending Title VII in 1972, the Congress gave every indication that the protection afforded by Title VII should be made more comprehensive rather than less so. Congress extended Title VII to educational institutions, which had been exempt, Pub.L.No. 92–261, § 3, 86 Stat. 103 (amending 42 U.S.C. § 2000e–1), with the effect that even universities' tenure decisions are subject to scrutiny under the statute. *See, e.g., Kunda v. Muhlenberg College,* 621 F.2d 532 (3d Cir.1980).[5]

The proper statutory construction of "employee" as used in 42 U.S.C. § 2000e(f) is not an issue that stands before the Court like an uncharted forest. Because other courts have established familiar landmarks, the Court need not rely exclusively on its own compass readings of legislative intent to guide the Court's present deliberations. Two decisions of the Seventh Circuit provide unequivocal support for the defendant's position. The first of these, *Burke v. Friedman,* 556 F.2d 867, 870 (7th Cir.1977) held that the common-law definition of employee should be controlling for the equal employment provisions of Title VII. Thus, in determining whether an accounting partnership met the jurisdictional requirements of fifteen employees, the Seventh Circuit held partners should not be counted as employees because partners are not employees at common law. *Id.* The Seventh Circuit extended their holding in *Burke* in the second decision to cover shareholders in

of disparate treatment is not onerous." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). "In a suit such as the one at hand, alleging discrimination in the termination of employment, the facts plaintiff must prove in order to establish a prima facie case will necessarily vary from those facts essential to a claim that the refusal to hire was discriminatory.... [T]he plaintiff nonetheless must offer sufficient evidence to create an inference that the employer's action was based on impermissible reasons." *Jackson v. U.S. Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980). *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

**5.** In addition, Congress rejected at the same time an amendment that would have exempted the employment of doctors and physicians by public or private hospitals. 118 Cong.Rec. 3800 (1972).

professional corporations. *E.E.O.C. v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir.1984). There, the court held that shareholders in a professional corporation resembled partners so closely that they should be treated the same for purposes of Title VII. *Id.* at 1178.[6]

While the Seventh Circuit decisions lend strong support to defendant's contentions, district courts in the Third Circuit are permitted to adhere to these precedents only if they are fully consistent with case law in the Third Circuit. Although the Third Circuit has never faced the issue of whether partners are employees for Title VII, that Court has nevertheless articulated standards that district courts in the circuit must apply in determining whether an individual is covered by the employment provisions of Title VII. The Third Circuit adheres to a hybrid "right to control/economic realities" standard that places primary but not exclusive importance on common-law principles of agency. *See E.E.O.C. v. Zippo Manufacturing Co.*, 713 F.2d 32, 36–38 (3d Cir.1983); *see also Spirides v. Reinhardt*, 613 F.2d 826, 831–32 (D.C.Cir.1979) (explaining hybrid economic realities test). This approach is not entirely consistent with the Seventh Circuit's exclusive reliance on common-law concepts in *Burke.* Therefore, at the very least, this Court must go through the hybrid economic realities calculus before it can determine whether Reiver's removal from the board of directors is cognizable under Title VII.

So far the Court has merely surveyed the landscape before launching an outright assault on the question before it. The Court's caution in this case is born not only from its recognition of both the importance and difficulty of the question confronting it, but also a profound disquiet over the posture in which this issue has been presented to the Court. The defendant has asked the Court to consider this extremely important question in a context in which the Court's decision will have no discernible effect on the rights of the litigants before the Court.

An examination of how a decision today will affect the final relief entered in this case vividly illustrates the hypothetical nature of the issue posed. Title VII authorizes this Court to provide equitable relief such as backpay and reinstatement to victims of employment discrimination. The ability of the Court to order such relief with respect to Reiver's removal as a director is severely limited because plaintiff has urged, as a separate claim, discrimination with respect to her termination. The Court is unable to order backpay relief for Reiver's removal as a director; any loss of compensation suffered by Reiver was as a result of her termination rather than her removal from the board. Similarly, reinstatement on the board of directors is wholly contingent on a finding that her termination was also in violation of Title VII for which she is entitled to reinstatement.[7]

---

6. Although this Court is aware of no court that has reached a result that contradicts the Seventh Circuit's conclusion on this issue, some circuit courts have reached results in related areas that indicate some uncertainty in the law. *See, e.g., Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir.1982) (holding that a non-shareholder's complaint against a corporation, consisting of shareholders and non-shareholders, alleging that shareholder status was regulated in a discriminatory fashion and that such status led to preferential treatment as an employee, stated a cause of action under Title VII), *cert. denied, —— U.S. ——,* 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984); *E.E.O.C. v. First Catholic Slovak Ladies Association,* 694 F.2d 1068 (6th Cir.1982) (although membership on board of directors was a prerequisite for consideration as an officer, salaried officers of association would be considered em-

ployees for purposes of the Age Discrimination in Employment Act.), *cert. denied,* 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983).

7. The Court will not consider Reiver's reinstatement as a director of Murdoch & Walsh unless it is previously determined that she has a right to reinstatement as an officer of the law firm. At a minimum, this will require a jury finding that Reiver's termination was the result of unlawful discrimination. Although typically a plaintiff has no Seventh Amendment right to a jury trial in a Title VII action, when there are overlapping issues of law and equity, as here, with the breach of contract claims and the discrimination in termination claim, the right to a jury decision in the contract claim extends to any issues of fact common to the breach of contract and Title VII actions. *See Lincoln v.*

Thus, even if Reiver convinces the Court that she was removed as a director for impermissible reasons, the Court may be unable to enter any relief on her behalf.[8] These considerations emphatically suggest that defendant's argument poses a speculative or hypothetical question rather than an actual case or controversy.[9]

■ The judicial power of federal courts as embodied in the requirements of Article III does not extend to the resolution of hypothetical or speculative questions. *See North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964). This Court cannot offer advisory opinions merely because a legal issue may be important. *See Hayburn's Case*, 2 Dall. 409, 2 U.S. 409, 1 L.Ed. 436 (1792); *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Rather, a federal court can only decide issues involving "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed.2d 617 (1937); *North Carolina v. Rice, supra*, 404 U.S. at 246, 92 S.Ct. at 404. Because the ability of the Court to enter relief on behalf of the plaintiff is speculative at best, a decision on whether Reiver, in her capacity as director of a law firm, was an employee

for purposes of Title VII would be purely advisory. Accordingly, the Court will refrain from issuing any such decision, unless and until either party can demonstrate to the Court that such a decision will have palpable consequences, in terms of the present controversy, on the legal interests of the parties.[10]

## III. THE MEASURE OF COMPENSATORY DAMAGES FOR THE CONTRACT CLAIM

The fundamental issue presented by the breach of contract claim is whether Reiver's termination was "for good cause" or "absent cause." Both parties agree that this issue of contractual liability involves disputed material facts that are appropriate for resolution only at trial. The defendant, however, challenges as excessive on any conceivable set of facts, plaintiff's demand for compensatory damages of at least $250,000. Part of the difficulty is that the plaintiff has not presented a precise method for calculating her contract damages. The complaint, however, specifically alleges that Reiver will earn almost $35,000 per year less in her new partnership than she would have earned at Murdoch & Walsh commencing April 1, 1983, a date almost four months after her purported termination for cause. (Amended Complaint ¶ 24). The defendant argues, even if the plaintiff's termination was absent good cause, the measure of compensatory dam-

---

*Board of Regents of the University System of Georgia*, 697 F.2d 928 (11th Cir.1983), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *Guyette v. Stauffer Chemical Co.*, 518 F.Supp. 521, 527 (D.N.J.1981); *cf., Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260 (1974); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470–73, 82 S.Ct. 894, 896–97, 8 L.Ed.2d 44 (1962). Ironically, the issue of Title VII liability will be decided by two different triers of fact in this case: the Court with respect to the removal claim and the jury with respect to the termination claim.

8. In addition, the Court's decision one way or the other on defendant's request for partial summary judgment on the Title VII claim will seemingly leave the evidence presented at trial unaffected.

9. The Court is also aware that Reiver's status as director might affect the calculation of front pay in lieu of reinstatement. *See, e.g., Goss v. Exxon Office Systems, Co.*, 747 F.2d 885 (3d Cir.1984). This issue is so remote at this point in the proceedings, it is largely conjectural.

10. While the Court's disposition of this issue is colored by its understanding of the "case or controversy" requirement of Article III, the Court does not mean to imply that it is constitutionally compelled to deny the justiciability of the question as presented. Rather, the Court, in recognition of certain prudential limitations having their foundation in Article III, merely defers any decision with respect to the question until the existence of a case or controversy can be ascertained with greater certainty.

ages for the contract claim is limited by the terms of the Employment Agreement relating to termination without cause to ninety days salary.

Under Delaware law, construction of a written contract does not raise an issue of fact which requires an examination of the intent of the parties unless the contract is ambiguous or contains irreconcilable provisions. *Myers v. Myers*, 408 A.2d 279, 280–81 (Del.1979); *Nepa v. Marta*, 415 A.2d 470 (Del.1980). When the terms of a written or oral contract are unequivocal, "it is for the Court to declare the effect of such a contract." *Reardon v. Exchange Furniture Store, Inc.*, 37 Del. 332, 188 A. 704, 707 (1936). The Third Circuit has stated, in giving effect on summary judgment to similar common law doctrines under the law of other states, that the district court may not grant the moving party's motion if the non-moving party provides a reasonable or plausible reading of the contract's literal terms. *See Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 256 (3d Cir.1982) (*quoting Landtect Corp. v. State Mutual Life Assurance Co.*, 605 F.2d 75, 80 (3d Cir. 1979)); *see also Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir.1979) (en banc) (applying Pennsylvania law to hold that ambiguity in contract's terms raised factual issue that could only be resolved by the jury).

■ Thus, the Court's first step in ascertaining the proper measure of damages is to look at the wording of the contract itself. The relevant sections of the Employment Agreement are as follows:

13. The term of Officer's employment under this Agreement shall commence as of the date of the Agreement and continue through the Corporation's current fiscal year end, continuing thereafter from year to year unless this Agreement is terminated as provided in § 14.

14. (a) Section 13 notwithstanding either Party may terminate this Agreement immediately for good cause.

(b) Either Party also may unilaterally terminate this Agreement at anytime absent good cause on ninety days' written notice. However, in the event the Corporation elects to terminate Officer pursuant to this subsection 14(b), such termination shall constitute the retirement of Officer for purposes of § 12 of this Agreement unless the Corporation's action is the unanimous decision of the Board (with Officer ineligible to vote if a director) and Officer is presented with written confirmation of such decision signed by each voting director.

There is no dispute that Murdoch & Walsh, in its hand-delivered letter of termination to Joanna Reiver, dated November 19, 1982, claimed to terminate Joanna Reiver "in accordance with paragraph 14(a) ... for good cause."[11] This action had the unanimous consent of the directors. Nor is there any dispute that on March 15, 1983, the defendant's attorney unequivocally informed the plaintiff's attorney that the termination letter of November 19th was also meant to effect the plaintiff's termination under ¶ 14(b) if it were subsequently found by a court that the termination was not "for good cause." What is in question is the legal effect of these communications under the contract.

Defendant contends that because it had the unanimous consent of the directors the termination was effective under ¶ 14(a) or at worst ¶ 14(b) and, therefore, compensatory damages cannot exceed the ninety day salary that plaintiff would be entitled to under section (b). Plaintiff argues in her brief that since the November 19th letter purported to terminate her for cause, the limitation of ¶ 14(b) does not apply. At oral argument, the plaintiff went so far as to suggest that the defendant could not

---

11. Paragraph 14 applies only to officers of the professional corporation. Although Reiver ceased to be a director as of October 11, 1982, she nevertheless remained an officer. Her status as an officer was controlled by the terms of her Employment Agreement with the defendant. Her position as a director, however, rested upon her inclusion among the slate of directors elected by the stockholders. Thus, Reiver could only be terminated through the procedures set forth in Paragraph 14.

proceed alternatively under the two sections of paragraph 14: either defendant was required to terminate Reiver under ¶ 14(a) without recourse to ¶ 14(b) or to terminate her under ¶ 14(b).

 The respective positions of the two parties suggest two separate legal questions. The first question concerns whether the defendant has the prerogative, within the terms of the contract, to act in the alternative with respect to the two sections. The Court holds as a matter of law that plaintiff's reading of the contract insofar as it implies a restriction on the defendant's capacity to act in the alternative under either ¶ 14(a) or ¶ 14(b) is incorrect both because no plausible explanation for such a limitation is provided and because it has no foundation in the literal wording of the contract. The plaintiff appears to argue that her interpretation of the contract can survive summary judgment merely because that interpretation is not expressly excluded by any provision in the contract. The Court cannot agree. In the absence of any corroboration in the language of the contract, the plaintiff must be able to point to some evidence regarding the formation of the contract or an instance in which the provision was so applied before her interpretation will be deemed plausible. Metaphysical uncertainty, alone, with respect to the parties' intent is not sufficient. *See Robin Construction Co. v. United States,* 345 F.2d 610, 614 (3d Cir.1965).

 Having determined that the contract permitted the defendant to act under ¶ 14(a) and (b) simultaneously, the Court turns to a very different question: At what point did the defendant exercise its right to terminate Reiver pursuant to ¶ 14(b)? The Court cannot agree with the defendant that the November 19th letter purportedly acting under ¶ 14(a), automatically triggered the provisions of ¶ 14(b), as a matter of law, in the event that Reiver's termination is subsequently held to be without cause. Whether the November 19th letter was sufficient to effectuate a termination pursuant to ¶ 14(b) is a jury question. The Court, however, holds as a matter of law that

irrespective of whether the November 19th letter was sufficient to effect a termination under ¶ 14(b), the letter of March 15th from defendant's attorney to plaintiff's attorney provided sufficient notice of the defendant's intention to proceed in the alternative under ¶ 14(b). Thus, if a jury subsequently determines that the termination was absent good cause, Reiver will be deemed to have been terminated pursuant to ¶ 14(b) without cause at the earliest, on November 19, 1982, and at the latest, on March 15, 1983.

 There remain a number of factual issues bearing on the measure of contract damages which this Court cannot resolve on a motion for summary judgment. If the jury determines that Reiver's termination was without cause, then it must also determine whether the mere unanimous consent of the directors in terminating Reiver for whatever reason was sufficient to effect a termination pursuant to ¶ 14(b). Although this question presents an issue of contractual interpretation, the language of the contract makes it impossible for the Court to determine what was intended by the parties and so the issue is properly within the province of the jury.

 Once the issues regarding the nature of Reiver's termination and the date at which the termination became effective are settled, the method for the jury to use in calculating damages can easily be described. If it is determined that Reiver was terminated with good cause, she is not entitled to any damages. If she was terminated without cause, then the defendant breached the contract in not giving the plaintiff the notice required by ¶ 14(b). The compensation a plaintiff is entitled to receive for a breach of contract is the sum that will place him in the same position in which he would have been, had the contract been performed, *see J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.,* 48 Del. 526, 107 A.2d 892, 894 (Del.Super.1954), including, of course, consequential losses attributable to the breach, and adjustments to the recovery for gains that an injured party receives that it would not have enjoyed in the absence of the breach. Apply-

ing this simple principle to the Employment Agreement in question yields the proper measure of damages. Under ¶ 14(b), the plaintiff was entitled to ninety days notice. Delaware courts have held, as a matter of law, that a ninety day notice provision in a termination clause limits the terminated party's damages to the benefits he is entitled to receive under the contract during the notice period. *Chrysler Corp. v. Quimby*, 51 Del. 264, 144 A.2d 885, 886 (1958) (construing Michigan law); *accord Paradee Oil Co. v. Phillips Petroleum Co.*, 320 A.2d 769 (Del.Ch.1974) (applying Delaware law and citing *Chrysler Corp.* with approval), *aff'd.*, 343 A.2d 610 (Del. 1975).[12] In this particular case, the benefits inuring to plaintiff had the contract been performed would have been salary and fringe benefits received during the notice period.[13] In addition, plaintiff is entitled to recover any consequential losses she may have suffered to her law practice caused by the absence of any notice. Of course, factual issues concerning what her salary was under the written contract or any oral modification of that agreement[14] along with any determination of the magnitude of the plaintiff's consequential damages are matters for the jury rather than this Court.

## IV. THE BONUS CLAIM

In the contract count of her complaint, the plaintiff alleges she has been wrongfully deprived of a portion of a bonus that she was owed by the defendant. The plaintiff does not dispute that in March of 1982 she agreed to a modification of the method for calculating her bonus provided in her written contract. She contends, however, that the Court should refuse to enforce the oral modification, and thereby permit the plaintiff to recover the entire bonus she was due under the preexisting written contract. Although plaintiff's presentation of her claim is hardly a model of clarity, the gist of her claim seems to be that the modification is invalid either because it was procured through duress or alternatively, because the defendant has breached its implicit promise of continued employment, a promise allegedly made to secure Reiver's consent to the reduction of her bonus. Defendant asks the Court to hold that the plaintiff's theories for recovery are defective as a matter of law. The Court does not agree and accordingly, denies the defendant's request for the reasons discussed below.

The briefs submitted to the Court reflect some confusion about the legal theories on which plaintiff is proceeding especially with regard to her status as an employee who could be terminated without cause. The effect of her status as an at-will employee[15] has entirely different consequences

---

12. Plaintiff points to language in *Paradee* suggesting that such an express right of termination is limited by considerations of equity. In fact, the Court's language suggests some ambivalence whether this is a correct reading of Delaware law. More importantly, plaintiff cannot merely allege that the termination clause in her contract was inequitable and thereby create a factual issue precluding summary judgment. The issue of equity must be raised in concrete terms; the plaintiff must point to the exceptional circumstances in this case that make this termination clause inequitable. Finally, in *Paradee*, although preliminary relief was granted to the terminated franchisee, relief was predicated on statutory grounds rather than common-law contract principles.

13. The plaintiff would also be able to seek any lost benefits under the contract if it is found that the beginning of the notice period did not coincide with Reiver's termination on November 19, 1982.

14. An oral modification to the Employment Agreement is at issue because of Reiver's November 8, 1982 memorandum demanding additional compensation in accordance with a tentative agreement purportedly made in April of 1982. Some issue was raised at oral argument whether an oral modification to a written contract containing a provision prohibiting oral modifications could be valid. The Court has no doubt that an oral modification can be valid in such circumstances. *See Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28 (Del.1972).

15. Although plaintiff was technically entitled to ninety days' notice and thus, not completely "at-will," the Court will use the "at-will" category to describe the fact that she could be terminated without cause by a majority of the directors.

for her claim depending on which legal theory plaintiff's claim is analyzed. Therefore, the Court turns to a consideration of each of plaintiff's theories.

### A. Breach of Promise of Continued Employment

The Court must first consider whether the oral modification of the compensation scheme through plaintiff's release created an enforceable agreement absent any duress. Plaintiff's relinquishment of a portion of her bonus would clearly be enforceable if, in return for her promise, she received some consideration. Consideration in a contract provides the first context in which the concept of employment at-will is used. Delaware courts have held that continued employment at-will can serve as consideration for a promise such as plaintiff's relinquishment of part of her bonus. *See Research Trading Corp. v. Powell,* 468 A.2d 1301, 1305 (Del.Ch.1983) (holding continued employment of an employee at-will represents valid consideration for a covenant not to compete).

Defendant seeks to take advantage of this principle and, at the same time, argue that since it promised only to continue plaintiff's employment at-will, it was not obliged to keep the plaintiff employed indefinitely. And indeed Delaware law is clear on this point; an employer retains an absolute right to discharge an employee at-will without cause. *See Heideck v. Kent General Hospital,* 446 A.2d 1095, 1097 (Del.1982) (affirming summary judgment for defendant against at-will employee alleging breach of employment contract); *Avallone v. Wilmington Medical Center,* 553 F.Supp. 931, 936–37 (D.Del.1982). There is an inherent difficulty, however, when an employer insists both that he possesses an absolute right of discharge with respect to an at-will employee and that his promise of continued employment to an at-will employee constitutes consideration for promises obtained from the employee.

If the employer retains an absolute right of discharge, the promise of continued employment is illusory and, therefore, cannot serve as consideration for another's promise. This difficulty was clearly recognized by Delaware courts in *Haney v. Laub,* 312 A.2d 330, 334 (Del.Super.1973) where the court held that a stock option agreement which was contingent upon an at-will employee's continued employment, limited the employer's otherwise absolute right to discharge that employee without cause. Thus, if defendant's position is that it made a promise, explicit or implied, of continued employment to Reiver as consideration for Reiver's release of part of her bonus, and if the jury finds that Reiver was terminated without cause, then the jury may also find that the defendant breached its duty of good faith bargaining in offering continued at-will employment in return for the modification.

Of course, defendant may deny that it intended Reiver's continued employment to serve as consideration for Reiver's release. Such a defense, however, would not defeat plaintiff's claim because the defendant would then face the possibility that Reiver's release was given without consideration. The Court expresses no opinion on the enforceability of a release secured without consideration, nor will the Court speculate on the legal consequences if Reiver's release is unenforceable.[16] The defendant need not rely on any of the foregoing theories and instead, may try to show that some other form of consideration was received by Reiver such as the voluntary relinquishment by the other directors of their rights under the compensation scheme. On whichever theory the defendant chooses to proceed, disputed issues of material fact remain that can only be resolved at trial.

### B. The Duress Claim

Even if the release would otherwise be enforceable, the plaintiff argues

---

16. The Court is reluctant to express any opinion on these issues because they were not briefed by the parties. The Court notes, however, that defendant's citation of cases regarding the waiv-er of constitutional right is completely inapposite to the question before the Court regarding contractual release.

that in this particular case it is voidable because her consent to the release was procured under duress. Reiver alleges she was pressured to relinquish her bonus in two ways: (1) some of the directors refused to speak to her; and (2) she was threatened with termination if she insisted on receiving the bonus. There is ample evidence in the record before the Court to conclude that there is a factual basis for these allegations and thus, on defendant's Motion for Partial Summary Judgment, these allegations must be assumed to be true.[17] Defendant contends that these allegations, even taken as true, cannot constitute duress because the defendant was not legally obligated to continue Reiver's employment, and moreover, because the allegations do not suggest that Reiver lacked reasonable alternatives or that she was bereft of the quality of mind essential to making a contract.

 As a federal court sitting in diversity, the Court must turn to the decisions of Delaware courts as the sole authority in resolving this issue of law. Unfortunately, Delaware law on the issue of duress is not well-developed. Thus, the Court must predict what a Delaware court would do if confronted by a similar question. *See Lang v. New York Life Insurance Co.*, 721 F.2d 118, 119 (3d Cir.1983). "To do so, [the court must] consider the policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts." *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 250 (3d Cir.1982).

*Fowler v. Mumford*, 48 Del. 282, 102 A.2d 535 (Del.Super.1954), marks the first and only time a Delaware court has confronted the availability of the doctrine of economic duress. Although the court refused to grant a motion to strike a defense based on economic duress as a matter of law, the court refrained from endorsing the validity of such a defense and merely noted that because the evolving nature of the doctrine of duress had come to include economic compulsion in other jurisdictions, Delaware courts would undertake to consider whether their notion of duress should be modified accordingly.

A defense of duress was raised more recently in *Research & Trading Corp. v. Powell*, 468 A.2d 1301 (Del.Ch.1983) in the context of an employment at-will situation. But there, Vice Chancellor Longobardi (now Judge Longobardi of the District Court of Delaware) never addressed the issue of duress squarely, and instead, held that an offer of continued employment to an at-will employee provided sufficient consideration to support an enforceable restrictive covenant on competition. *Id.* at 1305.

Delaware courts have freely recognized doctrines closely related to economic duress such as undue influence. Although undue influence is typically applied to situations involving confidential or fiduciary relationships, *see, e.g., Robert O. v. Ecmel A.*, 460 A.2d 1321 (Del.1983), *Robert O.* clearly establishes that the doctrine extends to other transactions so long as four essential elements are present.[18] *Id.* at 1323. Based on these limited precedents, the Court predicts that a Delaware court

---

**17.** Defendant's Reply Brief in Support of Its Motion for Partial Summary Judgment, accurately summarizes the issue:

"It is certainly true that plaintiff was presented with a choice and, for purposes of this motion, one must assume that the choice was to accept the reduced bonus or face a serious risk that she would have to leave the law firm. It is undisputed that plaintiff could have insisted on the receipt of the full amount of the bonus, but by doing so would thereby have thrown down the gauntlet to the other directors and invited immediate severance of her employment relationship with the firm."

Reply Brief at 17–18.

**18.** These four elements are unimportant to the Court's purposes now, but they are indicative of the kinds of wide-range considerations Delaware courts are willing to undertake in extraordinary circumstances. The four elements are: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert such influence; and (4) a result indicating the presence of undue influence. *Robert O. v. Ecmel A.*, 460 A.2d 1321, 1323 (Del.1983).

would recognize the validity of a claim or defense based on economic duress.

The *Restatement (Second) of Contracts* § 175(1) (1979) sets forth the general rule with respect to duress:

> "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." [19]

Defendant contends that its use of threats to terminate Reiver to obtain her consent to the release represents nothing more than hard-nosed bargaining rather than an improper effort to pressure her. Indeed, it has been pointed out that the essence of any contract involves an implied threat by one party to another to make a contract on certain terms or risk losing the benefit of the first party's promise. *Restatement (Second) of Contracts* § 176 comment a (1979). Since continued employment of an at-will employee represents valid consideration for a contract, defendant asserts that threats to discontinue an at-will employee cannot serve as the basis for a claim of economic duress.

The problem with this conclusion is that it assumes that threats to take action which one is not contractually obligated to forbear cannot be deemed improper. The bulk of authority is otherwise. "Even acts lawful and nontortious may be wrongful depending on the circumstances." S. Williston & W. Jaeger, *Williston On Contracts* § 1606 (3d ed. 1970).[20] *See Fowler v. Mumford,* 48 Del. 282, 102 A.2d 535, 538 (Del.Super.1954) ("It is true that under the modern view, acts or threats cannot constitute duress unless they are wrongful; but an act may be wrongful though lawful."). Several cases have recognized the validity of claims or defenses based on economic duress involving the threatened termination of at-will employees. *See Laemmar v. J. Walter Thompson Co.,* 435 F.2d 680 (7th Cir.1970) (applying Illinois law) (in an action to rescind sale of stock, threats of termination unless employee resold previously acquired company stock to company's officers provided foundation for employee's claim of duress); *Shurtleff v. Giller,* 527 S.W.2d 214 (Tex.Civ.App.1975) (applying Texas law) (holding that promissory note was unenforceable when employee signed note only after superior's threat of termination); *see also Simko, Inc. v. Graymar Co.,* 55 Md.App. 561, 464 A.2d 1104, 1108 (1983) (applying Maryland law) (holding that restrictive covenant that employee agreed to only after being threatened with termination was enforceable but noting that such threats would constitute duress if used to obtain concessions with respect to already accrued or separate benefits un-

---

**19.** Defendant relies on the characterization of the two elements for economic duress set forth in *Williston:*

> 1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and
> 2. Such act or threat must be one which deprives the victim of his unfettered will.
> As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining a gain, there is not duress; it must be made solely for the purpose of protecting the victim's business or property interests. Finally, the party threatened must have no adequate legal remedy. (footnotes omitted).

13 S. Williston & W. Jaeger, *Williston On Contracts* § 1617 (1970). While this definition is perhaps more favorable for the defendant, many of the parts that defendant seeks to rely on most are qualified in other parts of the section, making the exact requirements of economic compulsion somewhat elusive. Thus, defendant's literal reliance on phrases such as "hope of obtaining gain" is misplaced. The Court, in general, finds that the *Restatement (Second) of Contracts* provides a clearer and more incisive analysis of the law of duress, and accordingly, it is followed here.

**20.** *Williston* repeats this comment in other forms at different points. *See* S. Williston & W. Jaeger, *Williston On Contracts* §§ 1607, 1617 (1970). This approach is also consistent with the *Restatement.* "(1) A threat is improper if ... (d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient." *Restatement (Second) of Contracts* § 176 (1970). "[A] threat may be a breach of the duty of good faith and fair dealing under the contract even though the threatened act is not itself a breach of the contract." *Id.* at § 176 comment e.

related to the ongoing employment relationship), *cert. denied,* 298 Md. 243, 469 A.2d 452 (1983).

The principle reflected in these cases is captured in an illustration to the Official Comment of the *Restatement:*

> A makes a threat to discharge B, his employee, unless B releases a claim that he has against A. The employment agreement is terminable at the will of either party, so that the discharge would not be a breach by A. B, having no reasonable alternative, releases his claim. A's threat is a breach of his duty of good faith and fair dealing, and the release is voidable by B.

*Restatement (Second) of Contracts* § 176 comment e, illustration 11 (1979). This illustration is arguably indistinguishable from the case before the Court.

 In view of these four factors—Delaware court's expressed willingness to consider evolving trends in the legal concept of duress; Delaware decisions recognizing undue influence as a basis for voiding contracts, the existence in other jurisdictions of decisions applying the concept of economic duress to agreements obtained through threats of termination to at-will employees, and the approach adopted in the *Restatement (Second) of Contracts* —the Court finds that, if a Delaware court were confronted with the case now before the Court, that court would hold that threats of termination of an at-will employee to obtain a release of already accrued benefits could form the basis of an action predicated on economic duress. Accordingly, the Court holds that Reiver has stated a prima facie case of duress in surrendering part of her bonus.

 Defendant separately contends that Reiver's claim is totally unbelievable. The victim of duress must be able to establish that the improper threat left him "no reasonable alternative" or "deprived [him] of his unfettered will." Defendant asserts that Reiver will never be able to establish this essential element. Reiver was an experienced attorney. Her future husband was an experienced attorney. At worst, if she had insisted on the bonus and then, had been fired, she would have received substantial severance benefits in the form of her bonus and ninety days pay. Reiver could, and eventually did go on, and set up her own practice. While all of these facts suggest that Reiver was not a victim of duress, these are facts that ultimately must be weighed by a jury. On a motion for summary judgment, the Court must draw inferences in a light most favorable to the non-moving party. *See* discussion *supra.* The defendant's threats of termination alone, is sufficient to create a disputed issue of material fact with respect to Reiver's claim.

## V. PUNITIVE DAMAGES

Defendant objects to plaintiff's efforts to recover punitive damages in connection with her breach of contract claims. The general rule in Delaware is that such damages are not available in an action for breach of contract. *J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.,* 48 Del. 526, 107 A.2d 892, 894 (Del.Super.1954). "In egregious cases of wilful and malicious breach of contract," however, recovery of punitive damages is permitted. *Casson v. Nationwide Insurance Co.,* 455 A.2d 361, 368 (Del.Super.1982). The difficulty in administering this standard is to determine what circumstances render a breach wilful or malicious.

 The function of punitive damages is not to compensate the injured party, but rather to punish the party causing injury for conduct that society finds either pernicious or reprehensible. *See Riegel v. Aastad,* 272 A.2d 715, 718 (Del.1970). In the context of tort actions, courts have looked to the intentional character of the conduct causing injury or to evidence of gross dereliction of a duty owed to the victim as the basis for permitting punitive remedies. This understanding is captured in Delaware decisions requiring evidence of wilful or wanton conduct. *See Cloroben Chemical Corp. v. Comegys,* 464 A.2d 887, 891 (Del.

1983); *Eustice v. Rupert,* 460 A.2d 507, 509 (Del.1983).

Despite the incongruity between conduct giving rise to tort liability and conduct giving rise to contractual liability, Delaware courts have imported the "wilful or wanton" standard for punitive damages used in tort actions to actions involving breach of contract. *See Nash v. Hoopes,* 332 A.2d 411, 414 (Del.Super.1975); *Serpe v. West American Insurance Co. of the Ohio Casualty Group,* Civ.No. 82C–AP–13 at 3 (Del. Super., June 28, 1984). Use of the borrowed standard is not without problems. A breach of contract typically involves purposive behavior which could loosely be considered wilful. The unqualified use of the wilful or wanton standard in actions for breach of contract raises the unsettling possibility that all or most breaches could lead to the recovery of punitive damages.

Rather than abandoning the wilful or wanton language, however, Delaware courts have formulated prudential limitations on the application of this standard to obligations arising from contract. Most obviously actions for breach occasioned by negligence are beyond the scope of conduct meriting punishment. *See Nash v. Hoopes,* 332 A.2d 411 (Del.Super.1975) (punitive damages disallowed in action by purchaser against vendor for failure to convey good title to property when vendor's error was unintentional); *McClain v. Faraone,* 369 A.2d 1090 (Del.Super.1977) (plaintiff was not permitted to recover punitive damages from attorney who was formerly employed by plaintiff, for attorney's failure to discover outstanding lien on residential property purchased by plaintiff). Contract breaches frequently arise when one party feels its non-performance of a condition is justified by the contract. In cases in which the breaching party's non-performance was based on that party's belief that a meritorious defense exists, Delaware courts have held as a matter of law that plaintiffs are not entitled to seek punitive damages. *See Casson v. Nationwide Insurance Co.,* 455 A.2d 361, 368 (Del.Super.1982) (holding that insurer's belief that it possessed a meritorious defense for non-payment of

benefits to the insured precluded plaintiff insured's efforts to recover punitive damages); *Serpe v. West American Insurance Co. of the Ohio Casualty Group,* Civ.No. 82C–AP–13 at 6 (Del.Super., June 28, 1984) (same). Finally, some breaches may be intentional and are referred to as efficient breaches when the payment of damages would be less costly than performance. Although the breach may be intentional, that fact alone does not entitle a plaintiff to seek punitive damages unless the intentional breach is similar in character to an intentional tort. *Smith v. New Castle County Vocational-Technical School District,* 574 F.Supp. 813, 836 (D.Del.1983).

■ These rather special considerations that come to bear in contract actions led one court to construe the "wilful or wanton" standard to mean "maliciously and without probable cause, for the purpose of injuring [the other party] by depriving him of the benefits of the [contract]." *Oliver B. Cannon and Son, Inc. v. Fidelity and Casualty Co.,* 484 F.Supp. 1375, 1388 (D.Del.1980) (*quoting Fletcher v. Western National Life Insurance Co.,* 10 Cal. App.3d 376, 89 Cal.Rptr. 78 (1970)). This is the standard the Court uses today in considering whether the record on summary judgment establishes any foundation for seeking punitive damages.

■ Reiver sets forth two contract claims, one for the bonus that she surrendered and the other related to her termination. Thus, the Court must determine whether, from the facts as they now stand, it could be inferred that the defendant's conduct should be penalized. The bonus claim itself is predicated on two different theories. The first of these is that a promise of continued employment was made to induce Reiver to surrender her bonus. The Court holds that such a theory lends itself to the recovery of punitive damages, but only if the plaintiff can show that such a promise was made with fraudulent intent. The added element of fraud is required to assure the presence of intentionally tortious behavior which would otherwise be

lacking if the claim is framed as an ordinary contract dispute.

 Reiver can also seek to void her claim based on economic duress. While duress typically suggests unconscionable conduct, such as physical threats, that merit punitive remedies, several factors indicate that defendant's conduct is not the kind that should be singled out for punishment. The claim of economic duress, in this instance, is based on means that are otherwise lawful. Moreover, threats of termination are not inherently impermissible in a bargaining situation. Rather, the issue of duress turns on whether the victim of the threats was deprived of the requisite quality of mind to form a binding contract. Finally, the Court's adoption of the *Restatement's* view on duress introduces a novel theory under Delaware law. As such, the theory could not have been anticipated by the defendant at the time of the alleged threats. Although the plaintiff may ultimately succeed in convincing a jury that her release was obtained under duress and, therefore, should be voided, she is not entitled to punitive damages as well.

Perhaps the strongest claim for punitive damages arises from Reiver's termination. The termination occurred in atmosphere of rancor and animosity that had existed for many months. The Court feels that the rancor or animosity, alone, does not provide a basis for punitive damages. No termination is ever pleasant. In this particular case, the ill will manifested itself in a comparatively tame fashion. Plaintiff was not subjected to a sustained campaign of verbal abuse or ridicule.

The personal animosity among the parties, however, may provide evidence of a wanton or malicious disregard of the defendant's contractual obligations. Asserting contractual rights with knowledge that such claims are unmeritorious or frivolous for the purpose of injuring another party is an example of conduct that could be deemed malicious. The defendant purportedly terminated Reiver for cause. If the jury determines that no cause, in fact, existed for the termination, then plaintiff is entitled to recover punitive damages if, in addition, she demonstrates that the defendant acted without any belief that the termination was properly for cause and the breach was undertaken to punish the plaintiff.[21] The Court will enter an Order in conformity with the holdings expressed herein.

---

21. Under Delaware law, the amount of punitive damages is limited by the magnitude of plaintiff's recovery of compensatory damages. *See Riegel v. Aastad,* 272 A.2d 715, 718 (Del.1970); *Malcolm v. Little,* 295 A.2d 711, 714 (Del.1972).

The Court's earlier comments regarding the measure of compensatory damages will necessarily establish an outer limit on any punitive damages plaintiff may be entitled to recover.